ATLANTIC CITY COIN & SLOT SERVICE COMPANY, INC., a New Jersey Corporation; and Mac Seelig, individually, Plaintiffs,

v.

IGT, a Nevada Corporation, Defendant.

No. 97–CV–6273 (SSB).

United States District Court,
D. New Jersey.

July 10, 1998.

Saiber Schlesinger Satz & Goldstein, LLC,
Newark, NJ by Arnold B. Calmann, Deanna
M. Beacham, Lauren Kende, for Plaintiffs.

Brown, Michael & Carroll, P.C., Atlantic City, NJ by Guy S. Michael, James J. Carroll, III, Leo Previti, Kirkland & Ellis, New York, NY by Yosef J. Riemer, Emily Bab, Lowenstein Sandler, P.C., Roseland, NJ by Samuel B. Santo, Jr., for Defendant.

BROTMAN, District Judge.

## I. Introduction

This case requires the Court to insert itself into the most fundamental business relationships in the Atlantic City casino gambling industry. One of the mainstays of modern-day games of chance is unquestionably the slot machine. Once crude, mechanical contraptions, slot machines, like everything else in life, have become technologically advanced and computerized. Just as the machines have changed over time, defendant IGT claims the casino industry has changed along with them. IGT now also seeks to change the nature of relationships in Atlantic City and the way slot machines are bought, sold, leased, and serviced in that city.

In most other gaming jurisdictions nationwide, IGT deals directly with its customers— the casinos. For the last 15 years, however, Atlantic City Coin & Slot Service Company, Inc. ("A.C.Coin") has been IGT's exclusive distributor and service company in Atlantic City. Following many years of financial success, IGT contends that a now dynamic gaming industry necessitates the freedom to sell directly to its customers. IGT has thus invoked its contractual right to terminate A.C. Coin's Exclusive Distributorship Agreement executed on June 12, 1993 ("the 1993 Agreement"), in what has been characterized as a pure "business" or "economic" decision. A.C. Coin, and its president, Mac Seelig, have made tens of millions of dollars and, alleging that they have enhanced IGT's image in the process, seek to prevent termination of their agreement. Presently before the Court is plaintiffs' motion for a preliminary injunction pursuant to FED. R. CIV. P.

65(c), seeking to preserve the status quo pending a final adjudication on the merits.

Plaintiffs bring this case pursuant to the New Jersey Franchise Practices Act .("the NJFPA" or "the Act"), *N.J.S.A.* 56:10–1 *et seq.* Their motion also alleges, *inter alia,* that IGT has tortiously interfered with their contractual relations and defamed them in their business.[1]

On March 19, 1998 this Court entered an Order to Show Cause and for related relief requiring IGT to show cause on May 20, 1998 why a preliminary injunction should not issue. Following entry of this Order, the parties' engaged in expedited discovery. By way of stipulation, the parties agreed to present no witness testimony at the hearing and instead presented oral argument on the injunction motion. *See* May 14, 1998 Letter of Guy S. Michael, Esquire. At the conclusion of the hearing and with the consent of the parties, the Court extended the life of the 1993 Agreement for an additional month. The expiration date is now July 12, 1998. The matter being ripe for disposition, the Court enters the following findings of fact and conclusions of law based on the affidavits, deposition testimony, documents and exhibits presented.

## II. Findings of Fact [2]

### (A) The Parties

A.C.Coin is a New Jersey corporation which has its principal place of business at 201 West Decatur Avenue in Pleasantville, New Jersey. Seelig Aff. ¶ 1; Am. Compl. ¶ 1. It is engaged in the business of distributing and servicing slot machines and related equipment for the casino industry. Seelig Aff. ¶¶ 2–4; Am. Compl. ¶ 1. Mac Seelig, who resides in Absecon, New Jersey, is the President of A.C. Coin. Seelig Aff. ¶ 1; Seelig Reply Aff. ¶ 1; Am. Compl. ¶ 2. Mac Seelig's sons Jeffrey and Jerald work for A.C. Coin, as Corporate Finance Manager

---

1. The parties have agreed that pending further discovery, plaintiffs' defamation claim is no longer the subject of this motion.

2. Due to the numerous factual findings required to be made in this matter and for the sake of readability, the Court has eschewed the tradition-

al practice of making such findings in individually numbered paragraphs. Substantively there is no difference, as that which is detailed in this section constitutes the reasoned assessment, based on the materials submitted by the parties, of the relevant facts which inform the Court's judgment.

and General Manager, respectively. J. Seelig Reply Aff. ¶ 1; Jerald Seelig Dep. 28:2–10. Jeffrey Seelig has been A.C. Coin's Corporate Finance Manager since May of 1994. J. Seelig Reply Aff. ¶ 2. He commenced working for A.C. Coin during his teenage years, performing a variety of functions, and began working as Senior Accounting Manager for the company after his college graduation. *Id.* Jerald Seelig has served as A.C. Coin's General Manager for the past five to six years, Jerald Seelig Dep. 28:2–10, and was an Assistant General Manager for approximately two years prior to this time, *id.* 16:13–14. He, too, worked for the company during his teenage years. *Id.* 28:2–10.

Defendant IGT is a wholly owned subsidiary of International Game Technology. Seelig Aff. ¶ 3; Am. Compl. ¶ 3; Answer ¶ 3. IGT's principal place of business is in Reno, Nevada, *id.*, and IGT is in the business of designing and manufacturing electronic gaming devices, *id.* For the past 15 years, A.C. Coin has distributed slot machines and electronic gaming devices manufactured by IGT pursuant to various distributor agreements. Seelig Aff. ¶ 4.

### (B) The 1983 Agreement

The first written agreement between the parties was signed in April of 1983, pursuant to which A.C. Coin began operating as IGT's agent with the exclusive right to distribute IGT products in New Jersey ("the 1983 Agreement"). Seelig Aff. ¶ 5, Exh. 1, 1983 Agreement.

Under the 1983 Agreement, A.C. Coin agreed to sell, lease, distribute and promote the sale of IGT products. *Id.* ¶ 6. A.C. Coin received commissions from IGT on each sale, and was entitled to increased commissions if it exceeded established sales thresholds or quotas. *See id.* and Exh.1, 1983 Agreement,

§ J and Exh. 2, March 19, 1985 Letter from IGT President J. George Drews to Mac Seelig. The 1983 Agreement required A.C. Coin to use its best efforts in selling and leasing IGT's products. *Id.* ¶ 7. The 1983 Agreement also required A.C. Coin to limit its sales exclusively to IGT products and expressly prohibited A.C. Coin from selling competitor products of IGT. McMonigle[3] Dep. 86:19–24; Bittman[4] Dep. 63:17–64:7. Mac Seelig himself agreed to abide by the restrictions on selling competitive products. Seelig Aff. ¶ 7 and Exh.1, 1983 Agreement, ¶ 1B. At IGT's insistence, A.C. Coin hired two IGT employees, Anthony Sicari[5] and Michael Hiltebrand[6] at the same level of pay and benefits, because of their specific knowledge of and experience servicing IGT products and to effectuate a smooth transition. *Id.* ¶ 7; Sicari Reply Aff. ¶ 4; Hiltebrand Reply Aff. ¶ 4. Both Sicari and Hiltebrand remain employed at A.C. Coin today. Sicari Reply Aff. ¶ 4; Hiltebrand Aff. ¶ 5.

The 1983 Agreement was extensive and detailed, and required A.C. Coin to:

(1) Sell or lease IGT products and parts at IGT's then current list price and/or standard terms as provided by IGT to A.C. Coin (Seelig Aff., Exh. 1, 1983 Agreement, ¶ 1I);

(2) Display advertising material as directed by IGT (*id.* ¶ 1O);

(3) Display a selection of IGT products, as determined by IGT, at A.C. Coin's sales/marketing facility in New Jersey (*id.* ¶ 1N);

(4) Stock an inventory of IGT parts at A.C. Coin's sales/marketing facility in New Jersey (*id.* ¶ 2A);

---

**3.** Robert McMonigle is the Executive Vice President of Sales for IGT. McMonigle Dep. 26:14–24.

**4.** Bob Bittman is the Executive Vice President of Product Development for IGT. Bittman Aff. ¶ 1.

**5.** Anthony Sicari is the Executive Vice President of Sales for A.C. Coin. Sicari Reply Aff. ¶ 1. He has been so employed for the past 15 years, encompassing the entire period of the A.C. Coin–IGT relationship. *Id.* ¶ 2. He was previously employed by IGT in Atlantic City from June 1980

through June 1983 as a service technician. *Id.* ¶ 3.

**6.** Michael Hiltebrand is the Director of Customer Service for A.C. Coin. Hiltebrand Reply Aff. ¶ 1. He has been employed by A.C. Coin for the past 15 years, encompassing the entire period of the A.C. Coin–IGT relationship. *Id.* ¶ 2. He was previously employed by IGT in Atlantic City from July 1982 through June 1983 as a service technician. *Id.* ¶ 3.

(5) Make available repair service for all IGT products at competitive rates (*id.* ¶ 2B);

(6) Use its best efforts to sell and lease IGT products (*id.* ¶ 1B);

(7) Keep accurate accounts, books and records and to make reports as required by IGT (*id.* ¶ 5A);

(8) Provide IGT with a written inventory of consigned machines and/or parts together with accounting records as to sales and service at the end of each quarter (*id.* ¶ 4);

(9) Make collections for IGT, as directed by IGT, and to forward all monies collected on IGT's behalf to its account (*id.* ¶ 5D);

(10) Pay IGT for the sales value of all IGT products and parts that were missing or stolen from stock, damaged or rendered unusable from any cause after the products had reached A.C. Coin's custody (*id.* ¶ 4);

(11) Provide IGT access to its premises at all reasonable times for the purpose of checking machine samples, parts in inventory and the sales and service records of A.C. Coin (*id.* ¶ 4);

(12) Act as liaison between IGT and governmental authorities at no cost to IGT (*id.* ¶ 9B); and

(13) Pay all costs of licensing proceedings, governmental investigations and approvals required by law (*id.* ¶ 9C).

In accordance with its contractual obligations, A.C. Coin immediately began promoting IGT's name, selling its products, and developing a customer base which began identifying A.C. Coin with IGT. Seelig Aff. ¶ 9.

In a few years, IGT sales flourished in New Jersey due largely to plaintiffs' efforts. A.C. Coin expanded its sales force, marketing facility and lines of business to accommodate that growth and to enhance IGT's sales. Seelig Aff. ¶ 10; Seelig Reply Aff. ¶ 12; Sicari Reply Aff. ¶ 7. As a result of the success of IGT's and A.C. Coin's joint efforts, IGT in 1985 expanded A.C. Coin's territory to include Puerto Rico and the Caribbean. Seelig Aff. ¶ 10. Shortly thereafter, IGT of-

ficially appointed A.C. Coin as its "authorized dealer for sales and service" in Puerto Rico. *Id.* and Exh. 3, Nov. 12, 13 1985 letters from William S. Redd, IGT Chairman of the Board, to Seelig. William S. Redd's November 12, 1985 letter recognized that A.C. Coin's efforts with IGT "have been a great success." *Id.* In 1986, the parties altered their method of selling and promoting IGT's products. Seelig Aff. ¶ 13. A.C. Coin agreed to purchase products directly from IGT and to resell them in A.C. Coin's newly expanded territory. *Id.* and Exh. 5, 1986 Agreement.

Before A.C. Coin became IGT's exclusive distributor in April 1983, IGT gaming machine sales represented less than 15 percent of the Atlantic City market and its product line was limited to video poker games. Seelig Aff. ¶ 11. In 1983, Bally Gaming dominated that market with approximately 70 percent of the product sales. *Id.* By 1992, however, IGT's market share of 37 percent had surpassed that of Bally's reduced 35–percent share. *Id.* Today IGT sales represent 62 percent of the Atlantic City market, whereas Bally's share is 22 percent. *Id.*; Exh. 4, June 1992 and Jan. 1998 Market Studies; J. Seelig Reply Aff., Exh. A, April 1998 Market Study.

#### (C) The 1993 Agreement

On June 12, 1993, the parties entered into the 1993 Agreement, the subject of this litigation. Seelig Aff. ¶ 14; Exh. 6, 1993 Agreement. IGT gave official notification of termination on September 3, 1997. *See* G. Thomas Baker Letter of Sept. 3, 1997. Like previous agreements, the 1993 Agreement contemplated renewal on an annual basis. *Id.* Upon IGT's specific demand, and as a material consideration for the 1993 Agreement, Mac Seelig agreed to participate substantially in the day-to-day control and operation of A.C. Coin, thereby foregoing other commercial opportunities. *Id.*; Exh. 6, 1993 Agreement, ¶¶ 1A and 1B. Although A.C. Coin specifically requested that the provision requiring Mac Seelig's substantial participation be deleted from the Agreement, IGT refused. Thomas McCormick Reply Aff. ¶ 5.[7]

---

**7.** Thomas McCormick, Esquire, is A.C. Coin's General Counsel. McCormick Reply Aff. ¶ 1.

Paragraph 1A of the 1993 Agreement granted to A.C. Coin the sole and exclusive, non-transferable license to purchase for re-sale, sell, promote and distribute IGT products in New Jersey, Maryland, and the Caribbean. Seelig Aff. ¶ 15; Exh. 6, 1993 Agreement. In addition, paragraph 1C(ii) of the 1993 Agreement provided for the servicing of IGT's progressive-linked systems games and other slot machines. *Id.* A.C. Coin was also granted exclusive distribution rights to service and sell IGT's replacement proprietary mechanical parts in paragraph 3 of the 1993 Agreement. *Id.*

The 1993 Agreement requires A.C. Coin to perform as follows:

(1) To use its best efforts in selling and distributing IGT products (*id.* ¶ 1);

(2) To purchase IGT products at IGT's then current retail price list, less 25 percent plus tax, shipping and all other costs attendant to delivery (*id.* ¶ 1Hi);

(3) To submit all orders in writing on IGT-provided forms and to pay reasonable expenditures incurred by IGT in connection with any canceled order (*id.* ¶ Hii);

(4) To pay for all orders in full within 45 days from the date of their delivery to A.C. Coin (*id.* ¶ 1Hiii);

(5) To refrain from directly or indirectly soliciting orders for, selling, leasing, promoting the sale of or otherwise dealing in certain products that competed with or were similar to IGT systems or products (*id.* ¶ 1B);

(6) To establish and maintain places of business satisfactory to IGT within the territory, *i.e.,* New Jersey (*id.* § 1L);

(7) To display advertising material supplied by IGT (*id.* ¶ 1N);

(8) To maintain an inventory of spare parts at its cost to meet customer needs (*id.* ¶ 2A).

(9) To make repair service available to customers within its territory at competitive rates (*id.* ¶ 2B);

(10) To keep and provide IGT with access to its accounts, books and records to facilitate IGT monitoring (*id.* ¶ 5A);

(11) To furnish IGT with monthly estimates or forecasts of A.C. Coin's requirements for ensuing months (*id.* ¶ 1I);

(12) To forward immediately every customer complaint, governmental order, advice or communication regarding IGT or its products (*id.* ¶ 5B);

(13) To act as liaison between IGT and governmental authorities, to coordinate and facilitate governmental investigation and location testing for IGT products (*id.* ¶ 10B);

(14) To have all persons employed by A.C. Coin properly covered by worker's compensation or employer's liability insurance (*id.* ¶ 1K);

(15) To indemnify and hold IGT harmless from any and all loss, damage, and costs IGT may sustain by reason of claims against IGT on account of acts of employees or agents of A.C. Coin (*id.* ¶ 1K).

The 1993 Agreement also authorized A.C. Coin, in Paragraph 1M, to use the IGT and International Game Technology registered trademarks and trade names in connection with the lease, operation, service and repair of IGT machines. *Id.* ¶ 16.

### *(i) A.C. Coin's New Jersey Place of Business*

With regard to IGT's requirement that A.C. Coin maintain a New Jersey place of business, there is no dispute that A.C. Coin has met this requirement. The 1993 Agreement clearly states, in relevant part, as follows:

*"L. Dealer Operating Requirement:* To provide appropriate representation, and facilitate proper sale and servicing of IGT products, Dealer shall establish and maintain places of business satisfactory to IGT, in its reasonable judgment, as to appearance, sales and service operations, parts inventory, and trained personnel and capital equipment. Such facilities shall be sufficiently established within the territory or area as set forth above to adequately meet, within IGT's reasonable judgment, the needs of customers within each area for which IGT products are located within the said territory ... *IGT agrees that [A.C. Coin's] existing facility meets IGT's stan-*

*dards for the Atlantic City casino market."*

Exh. 6, 1993 Agreement, ¶ 1L (emphasis added). A.C. Coin employs approximately 132 people, 108 of which are employed at A.C. Coin's Pleasantville facility. Seelig Aff. ¶ 26.

*(ii) A.C. Coin's License to use IGT's Trademarks and Name*

For nearly 15 years, IGT has referred to A.C. ·Coin as its exclusive distributor in its own brochures, advertising, and other media such as trade magazines and newspaper articles. *Id.* ¶ 27; Exh. 11, April 24, 1987 IGT Press Release; July 1996 Mission Statement. Morro Dep. 32:18–21.[8] The 1993 Agreement authorizes A.C. Coin to use IGT and International Game Technology registered trademarks and trade names in connection with the sale, lease, operation, service, and repair of IGT machines. Seelig Aff. ¶ 28; Exh. 6, 1993 Agreement, ¶ 1; Rivera[9] Dep. 139:12–22. IGT also granted A.C. Coin a separate license to use IGT's trademarks, copyrights and designs on outside billboards, in media communications and other similar or related advertising venues. *Id.* This license has been periodically renewed and amended to include new IGT trademarks and copyrights as new gaming devices developed. *Id.;* Exh. 12 (and Trademark and Copyright Licenses and amendments or extensions thereto). With IGT's knowledge, and pursuant to the various contractual provisions authorizing and obligating A.C. Coin to advertise that it is IGT's exclusive distributor, A.C. Coin uses and displays IGT's name in a number of ways:

(1) A.C. Coin's reception area prominently displays the IGT trade name and logo (Seelig Aff. ¶ 29; Exh. 7, photographs; Hanlon[10] Dep. 18:6–19; Perskie Aff. ¶ 7);[11]

(2) A.C. Coin's company brochure contain IGT's trade name (Seelig Aff. ¶ 29C; Exh. 13, brochure; Hanlon Dep. 18:6–19);

(3) A.C. Coin advertises in, among other sources, the Yellow Pages and gaming industry trade publications that it is the exclusive distributor for IGT in New Jersey. These advertisements contain both the IGT and A.C. Coin marks and logos (Seelig Aff. ¶ 29C; Exh. 14, Yellow Pages advertisements from 1983 to 1996 and exemplar advertisement; Morro Dep. 152–21–153:8; 153:24–154:18);

(4) Trucks and vans used to transport shipments from A.C. Coin's warehouses to customers prominently display the IGT name and logo and advertise A.C. Coin as the "Exclusive Distributor for IGT" (Seelig Aff. ¶ 29D, Exh. 15, photographs; Hanlon 18:6–19; Perskie Aff. ¶ 7; Morro Dep. 152:21–153:8, 153:24–154:18);

(5) A.C. Coin's letterhead, as well as stationery and business cards combine the A.C. Coin and IGT names and logos (Seelig Aff. ¶ 29E, Exh. 16 letterhead and business cards; Hanlon 18:6–19; Perskie Aff. ¶ 7; Morro Dep. ·152:21–153:8, 153:24–154:18);

(6) A.C. Coin distributes various advertising and promotion materials from IGT, including IGT shirts and bags (Seelig Aff. ¶ 29F, Exh. 17, photographs);

---

8. Stephen Morro is the Director of Progressive Systems for IGT in Atlantic City. Morro Aff. ¶ 1.

9. Ronald Rivera is the Vice President of U.S. Sales for IGT. Rivera Dep. 21:2–5

10. David P. Hanlon is the Executive Vice President, Chief Operating Officer of Rio Hotel & Casino, and President and Chief Operating Officer of Rio Suites Hotel & Casino. He is also the former President, Chief Executive Officer of IGT. He additionally served as President of Harrah's in Atlantic City, as President and Chief Executive Officer of Merv Griffin's Resorts International in Atlantic City and the Bahamas, and as Chief Financial Officer for Caesars World Incorporated, Atlantic City. Hanlon Dep. 6:14–8:12

11. Stephen Perskie is a stockholder in the law firm of Horn, Goldberg, Gorny, Plackter, Weiss & Perskie, P.C. in Atlantic City. Perskie Aff. ¶ 1. He has been familiar with and involved in gaming industry matters for over 20 years. *Id.* ¶ 2. He was the author and prime sponsor of the New Jersey Casino Control Act in 1977, served as a Judge of the New Jersey Superior Court, served as Chairman of the Casino Control Commission, which is responsible for the licensing and regulation of Atlantic City casinos and casino-related enterprises, and became Executive Vice–President, General Counsel and Director of Players International, Inc., a multi-state casino firm before joining his present law firm. *Id.* ¶¶ 2–4.

(7) A.C. Coin has ordered and distributed as gifts various other items containing the IGT trade name (Seelig Aff. ¶ 29G);

(8) Technician carts, service manuals, testing machines and numerous other items used in A.C. Coin's sales/marketing facility display the IGT trade name and logo (Seelig Aff. ¶ 29H, Exh. 18, photographs);

(9) The uniforms worn by A.C. Coin's field service people, technicians and inhouse employees display the IGT trade name and logo (Seelig Aff. ¶ 29I, Exh. 9, photographs; Perskie Aff. ¶ 7; Morro Dep. 158:8–17);

(10) A.C. Coin has participated in numerous trade shows in which it has prominently displayed the IGT mark, trade name, logo and products in conjunction with A.C. Coin (Seelig Aff. ¶ 29J, Exh. 20, photograph in March 1987 Casino Gaming Magazine; Perskie Aff. ¶ 7); and

(11) A.C. Coin has hosted many customer events on IGT's behalf and has used IGT's trade name in connection therewith (Seelig Aff. ¶ 29K; Perskie Aff. ¶ 8; Robbins [12] Aff. ¶ 15F; Sutor [13] Dep. 24:14–25:2; Tjoumakaris [14] Dep. 89:24–90:8; Jonas [15] Dep. 22:16–23:11; Morro Dep. 82:3–85:3, 144:1–146:21).

A.C. Coin is additionally required to display advertising materials supplied by IGT and to use its service manuals, product brochures, payout percentage sheets and other sales tools provided by IGT to promote the IGT name and the sales of its products. Seelig Aff. ¶ 30; Exh. 6, 1993 Agreement, ¶ 1N; Sicari Reply Aff. ¶ 14. IGT, moreover, has provided A.C. Coin employees with name tags bearing both the IGT and A.C. Coin names which they were required to wear at the Las Vegas Gaming Exposition. Seelig Aff. ¶ 30; Exh. 21, photocopy of pin. IGT has included A.C. Coin's name in its own advertisements; one in particular congratulated the Showboat casino on its grand opening and included A.C. Coin's name in the advertisement. *Id.;* Exh. 22, advertisement. IGT has also recognized A.C. Coin's efforts and their close relationship. Seelig Aff. ¶ 39; Exh. 55, Sept. 3, 1997 Baker Letter.

Since 1983, A.C. Coin's reputation throughout New Jersey and other territories has been exclusively as a distributor of IGT games or as IGT's agent. Seelig Aff. ¶ 49; Sutor Dep. 12:14–23; Tjoumakaris 75:5–11; Jonas Dep. 16:2–14; Perskie Dep. 29:17–30; Hanlon Dep. 13:11–14:22. A.C. Coin, in fact, has been referred to as IGT's "Eastern distributor." Exh. 26, July 31, 1986 IGT Press Release; Exh. 27, Dec. 27, 1984 Letter from D. Garcia, IGT Sales Director to Showboat Casino; March 19, 1987 IGT Press Release, Casino Gaming Magazine article; Nov. 17, 1988 IGT letter to Hyatt Hotels.

This reputation has been confirmed by several present and former Atlantic City casino executives. No less than IGT's former President, David P. Hanlon, who was once an executive in Atlantic City before becoming IGT's President, testified as follows:

Q: During your years as an executive in Atlantic City, did you view A.C. Coin as acting interdependently with IGT in connection with slot machine products? . . .

A: Yes.

Q. What is your understanding of the term "interdependently"?

A: They sort of worked hand in glove. They provided the product in the sense that Mac Seelig, he made whatever adjustments were necessary on

---

**12.** Richard L. Robbins is a Certified Public Accountant and a partner of Arthur Anderson, LLP. Robbins Aff. ¶ 1. He has served as the partner in charge of Arthur Anderson's work for A.C. Coin since 1995 and is fully familiar with the books and records and business operations of A.C. Coin. *Id.* ¶ 3. He has substantial education and experience in accounting and business advisory services, particularly in the gaming industry. *Id.* ¶¶ 1–2.

**13.** Edward J. Sutor is the Senior Vice President of Finance of Caesars in Atlantic City. Sutor Dep. 6:18–23.

**14.** Paul S. Tjoumakaris is the Senior Vice President of Slot Operations of Caesars' in Atlantic City. Tjoumakaris Dep. 70:10–71:10.

**15.** Dave Jonas is the Vice President of Operations of the Showboat Casino in Atlantic City. Jonas Dep. 7:15–16.

that, and he was responsible for the sales of those products and was, in fact, the representative of IGT in the Atlantic City market.

Q: Thank you. Now, during your time and tenure as president of IGT, would that same thing be true, that is, did you view A.C. Coin as acting interdependently with IGT? . . .

A: Yes, that was my view at that time, also.

Hanlon Dep. 16:12–17:7. Edward J. Sutor, Vice President of Finance at Caesars, testified similarly:

Q: Would you view them as one and the same in connection with the sale of I.G.T. gaming products?

A: In a way. When we think about buying I.G.T. slot machines, it's Mac's name comes up [sic]. I don't know how else to answer it.

Q: You testified earlier that you thought that A.C. Coin and I.G.T. were interdependent where slots were concerned. What do you mean by interdependent?

A: Well, I thought them the same way [sic]. *I mean, if you think about buying I.G.T. slot machines, I could picture Mac's face.* I mean, that [sic] who you get your I.G.T. machines from. That's the way it's been. So they're almost synonymous.

Sutor Dep. 50:14–22 (emphasis added). Paul S. Tjoumakaris, Senior Vice President of Slot Operations for Caesars, viewed A.C. Coin and IGT as being married:

Q: During the years that you have been with Caesars, is it your view that A.C. Coin's identity and business were synonymous with I.G.T.?

A: Most of the years that I dealt with A.C. Coin, I.G.T.'s [sic] synonymous with A.C. [Coin] because of their arrangement, distribution, basically is how I look at it. Tjoumakaris Dep. 97:10–16.

\* \* \* \* \* \*

Q: Over the years would you have come to view A.C. Coin as the alter ego of I.G.T. or as one and the same with I.G.T.?

A: Again when you look at the slot product, you could say because of the marriage for so long, you could say it's almost the same. . . . Tjoumakaris Dep. 106:13–18.

As further evidence of the A.C. Coin–IGT interdependence, on one particular occasion, at IGT's request and A.C. Coin's cost, Mac Seelig flew out to Las Vegas and obtained a $3 million tracking system order for IGT. Seelig Aff. ¶ 44. In that instance, IGT was attempting to sell what is known as the EDT slot tracking system to Caesars Palace, Las Vegas, Nevada and learned that Caesars was instead leaning toward purchasing a slot data system from Bally's, an IGT competitor. *Id.* Knowing that Mac Seelig had a good relationship with Caesars' Director of Slot Operations, George Thompson, IGT asked Seelig to convince Caesars to buy IGT's tracking system. *Id.* Seelig flew out to Las Vegas, met with Thompson, and closed the sale for IGT the next day. *Id.* Neither Seelig nor A.C. Coin received any compensation for these efforts. *Id.*

### (iii) A.C. Coin's Other Businesses

A.C. Coin has provided additional gaming-related products, such as slot bases, custom designed signs, and IGT-themed glass for use in IGT machines. Seelig Aff. ¶ 32. A.C. Coin also creates custom designs and casino floor plans for individual casinos. *Id.* Caesars' Sutor and Tjoumakaris both believed it to be important that A.C. Coin was able to offer a full array of products and be a full-service company. Sutor Dep. 12:5–13; Tjoumakaris Dep. 85:12–19. Specifically, it is A.C. Coin's Graphics segment which designs glass themes for use on IGT slot machines. Rivera Dep. 223:3–10. Not only have these custom themes enhanced IGT's sales, but according to Jonas, of Showboat casino, the machines were made more attractive to casino operators and customers. Jonas Dep. 13:4–8. The Graphics division has, however, consistently operated at a loss. J. Seelig Reply Aff. ¶¶ 6–7.

Another A.C. Coin division, A.C. Electronics Supply Company, facilitates timely deliv-

ery of IGT parts and orders. Seelig Aff. ¶ 35. This division maintains a complete stock of replacement and conversion parts for IGT slot machines and provides service and maintenance virtually on demand—a function IGT could not perform on its own. *Id.;* Exh. 24, April 15, 1986 Mem. to A. Sicari from D. Farinella, A.C. Coin's Service Manager. International Casino Supply ("ICS") was created by A.C. Coin to allow casinos to buy all of their products from one source. *Id.* ¶ 36. ICS products include slot bases, casino seating, table games, and keno systems. *Id.;* J. Seelig Reply Aff. ¶ 4. For the past four years, this division has operated at a loss, even though IGT is one of its largest purchasers of chairs. J. Seelig Aff. ¶ 4. The viability of this aspect of A.C. Coin's business is dependent on IGT's purchasing of chairs, which it has done in the amount of approximately $1,271,000 in 1996 through 1997, and of "signage." J. Seelig Reply Aff. ¶¶ 4,6; Seelig Reply Aff. ¶ 14; McCormick Reply Aff. ¶ 8.

While A.C. Coin does have these other divisions within it, and provides customers with other services, the majority of A.C. Coin's sales and income derive from the sale, leasing, and servicing of IGT slot machines. Robbins Aff. ¶¶ 5–11, 16. In 1997, for instance, A.C. Coin's revenue from the sale and leasing of IGT slot machines, totaled over $24 million. Seelig Aff. ¶ 46. While there are other aspects of A.C. Coin's business arguably related to IGT, this amount alone substantially exceeds the New Jersey Franchise Practices Act requirement that the purported franchisee derive 20 percent of its business from the alleged franchisor.

*(iv) Franchise-specific investments*

In 1990, A.C. Coin expanded its operations, opening its newest facility in Pleasantville, New Jersey to provide an up-scale sales/marketing center to promote IGT products. Seelig Aff. ¶ 67; Robbins Aff. ¶ 15A; McMonigle Dep. 95:3–10. A.C. Coin has spent nearly $2 million for the purchase and improvements to this facility, most of which is devoted to displaying, warehousing and servicing IGT products. Seelig Aff. ¶ 67; Robbins Aff. ¶ 15A. A.C. Coin has spent thousands of dollars expanding its storage area in this facility. Seelig Aff. ¶ 67. This facility is of no use outside the IGT relationship, because it is tailored specifically to comply with A.C. Coin's obligations under the 1993 Agreement. Seelig Dep. Vol. 1, 269:25–270:9; Robbins Aff. ¶ 15A; Sicari Aff. ¶¶ 7, 11; Sicari Dep. 30:24–31:6, 31:18–32:2. In addition, A.C. Coin leases three other warehouses totaling over 27,000 square feet, devoted primarily to storing, testing, and servicing IGT gaming devices. Seelig Aff. ¶ 68; Sicari Dep. 28:6–29:11 (IGT Vol.). A.C. Coin pays a substantial amount of rent on those facilities each month. Seelig Aff. ¶ 68. A.C. Coin recently purchased new radios allowing A.C. Coin service technicians to be reached while on call in order to respond to additional service calls, thus enhancing the service response by A.C. Coin for IGT's direct benefit. Seelig Aff. ¶ 69. A.C. Coin has also purchased IGT machines every year to be used for demonstrations and which are displayed in A.C. Coin's showroom. Seelig Aff. ¶ 71; Robbins Aff. ¶ 15E; Hanlon Dep. 20:13–17. In addition, A.C. Coin has purchased other IGT-related products, such as IGT service manuals and testing machines, which cost thousands of dollars and are not usable without the ability to sell and service IGT products. Seelig Aff. ¶ 71; *see* Robbins Aff. ¶ 15E; Hanlon Dep. 20:18–20. IGT also required A.C. Coin to construct a room within the marketing/sales center with state-of-the-art security and surveillance to be used by A.C. Coin to copy IGT licenses onto computer chips in IGT slot machines. Robbins Aff. ¶ 15D.

Over the past 15 years, A.C. Coin has spent hundreds of thousands of dollars developing new business for IGT and A.C. Coin. Seelig Aff. ¶ 72. This has taken the form of receptions, cocktail parties, barbecues, dinners, golf outings and community and charitable events related to the promotion of IGT products. *Id.* ¶¶ 58, 62–65, 72; Perskie Aff. ¶ 8; Robbins Aff. ¶ 15F; Hanlon Dep. 20:21–24; Morro Dep. 82:3–85:3, 144:1–146:21; Sutor Dep. 24:14–25:2; Jonas Dep. 22:16–23:11. This is money already spent and has not, and could not, benefit another prospective customer of A.C. Coin. The same holds true for the monies spent in the past advertising under IGT's trade name (*i.e.,* promotional

items, Yellow Pages advertisements, display of the IGT logo). Seelig Aff. ¶ 73; Robbins Aff. ¶ 15G.

With regard to A.C. Coin's work force, the company has spent hundreds of thousands of dollars to recruit, train, and retrain its highly technical work force on IGT-specific knowledge. Seelig Aff. ¶¶ 24, 74; Robbins Aff. ¶ 15H; Seelig Reply Aff. ¶ 13; Sicari Reply Aff. ¶¶ 6, 8–9; Hiltebrand Reply Aff. ¶¶ 7–8, 10–12; Hanlon Dep. 19:3–22. IGT's former president testified that, "To the extent it was an IGT machine, it would have certain things that were different than other manufacturers." Hanlon Dep. 19:3–22. A.C. Coin employees have been trained exclusively on IGT's gaming machines and products. Sicari Aff. ¶ 14; Hiltebrand Reply Aff. ¶ 14. This training has taken place either at A.C. Coin's facilities in Pleasantville, New Jersey or at IGT's facilities in Nevada. *Id.*

The affidavit of Daryl Robert Sertell,[16] suggests that the skills learned by A.C. Coin employees as to the repair and retraining on IGT machines are transferable. *See* Sertell Aff. ¶¶ 10–15. There being no assertions in his affidavit that he has ever personally repaired an IGT machine, trained or retrained an A.C. Coin technician on an IGT machine, reviewed IGT's service manuals which are updated regularly, or reviewed or received any IGT memoranda regarding service updates, Sertell lacks the requisite personal knowledge to accurately testify as to the transferability of A.C. Coin employees' training and retraining on IGT gaming devices. *See id.*

A.C. Coin has expended significant resources acting as a liaison between IGT and governmental agencies to facilitate investigation and location testing of IGT machines. Seelig Aff. ¶ 75; Hanlon Dep. 20:25–21:2. Most significant was its lobbying and other efforts in 1992 to obtain the repeal of the New Jersey Casino Control Commission regulation which prohibited a casino from using more than 50 percent of any one manufacturer's slot machines. Seelig Aff. ¶ 77; Perskie Aff. ¶¶ 8–9; Perskie Dep. 10:25–12:13, 13:14–14:8, 20:11–21:15, 23:25–24:23; Morro Dep.

180:2–182:9. As the primary beneficiary of that revised regulation, IGT has been, and will be, able to maintain or increase its market share in Atlantic City. Seelig Aff. ¶ 77.

As a very tangible financial investment, to support the current and anticipated growth of IGT business, A.C. Coin arranged for substantial lines of credit and borrowing. In 1991, A.C. Coin started its IGT slot machine leasing program which required substantial additional cash requirements and resources of A.C. Coin. Considerable interest requirements have been incurred by A.C. Coin to service its debt obligations, which were necessary to operate and build its IGT slot machine and related business. The cumulative interest and other loan compliance-related costs approximate $1,400,000. Robbins Aff. ¶ 15K.

The non-transferability of a good number of A.C. Coin's tangible and intangible assets is clear due to the relative lack of manufacturers nationwide who use distributors; the exceptions to this general trend include (1) a single sales agency relationship was recently established by a small supplier of gaming devices, and (2) by law in Louisiana, slot machine sales to Louisiana river boat operators must be made through a Louisiana-based distributor or agent. Seelig Aff. ¶ 79; Seelig Reply Aff. ¶ 28; McCormick Reply Aff. ¶ 9 and n. 1. All other major gaming manufacturers, such as Aristocrat, Bally's, and Sigma, sell directly to casinos and do not use distributors. Seelig Aff. ¶¶ 79, 90, 104; Seelig Reply Aff. ¶ 28; McCormick Reply Aff. ¶ 9; Sutor Dep. 21:16–19; McKoy Dep. 25:19–26:1; Tjoumakaris Dep. 99:3–100:2. There are two small manufacturers of multi-coin video products—VLC and Atronics—that use distributors in Atlantic City. Seelig Reply Aff. ¶ 28 n. 1; McCormick Reply Aff. ¶ 9 n. 1; Tjoumakaris Dep. 123:18–24. Collectively, these two manufacturers have less than 1 percent of the market, which is not comparable to IGT's 62 percent market share and recognized superior slot machines and systems games. Seelig Reply Aff. ¶ 28 n. 1; McCormick Aff. ¶ 9; Tjoumakaris Dep. 99:13–24.

---

16. Sertell is a professional slot machine instructor licensed by the Casino Control Commission and is Chairman of Casino Horizons Corporation. Sertell ¶ 1.

A.C. Coin took in approximately $38,000,-000 in net revenue during 1997. Robbins Aff. ¶ 4. The company's predominant sources of revenue derive from the slots, parts, and service of IGT machines. J. Seelig Reply Aff. ¶ 5. Based on the analysis of accountant Richard L. Robbins, CPA, of Arthur Anderson & Co., LLP, in 1997, A.C. Coin's IGT net revenues ranged from 90 percent for parts, 96 percent for service, 98 percent for slot sales, and 99 percent for leasing. Robbins Aff. ¶ 9 and Exh. II; J. Seelig Reply Aff. ¶ 5. IGT has presented no evidence that A.C. Coin has not performed its obligations satisfactorily under the 1993 Agreement or engaged in wrongdoing of any kind. *See* Sept. 3, 1997 Baker Letter.

*(v) Irreparable Harm*

The two companies' success is a result of A.C. Coin's access to top Atlantic City casino officials. "Through hard work and dedication, I have established personal and professional relationships with casino operators in Atlantic City," Seelig has boasted. Seelig Aff. ¶ 2. He has known most of the casino operators in Atlantic City for the past ten to twenty years. Seelig Dep. V.1 205–14. There is, in fact, testimony that Seelig was approached by various gaming manufacturers about distribution of their product during the period of his obligation to IGT. (Seelig Dep. V.1 168–71; v.2 16).[17]

For the past 15 years, however, A.C. Coin's employees have consistently promoted IGT's products as being superior to the products of other gaming device manufacturers and have explained the inferior nature of competitive products. Seelig Reply Aff. ¶ 8; J. Seelig Reply Aff. ¶ 9; Sicari Reply Aff. ¶ 17; Hiltebrand Reply Aff. ¶ 16; Sutor Dep. 22:11–19; McKoy Dep. 25:19–26:1: Jonas Dep. 24:9–10; Morro Dep. 116:8–15. Accordingly, A.C. Coin would have a substantial credibility problem if it suddenly began marketing and promoting another supplier's products as being "superior," assuming there was a comparable supplier available. Seelig Aff. ¶¶ 38, 57, 78–19, 90; Seelig Reply Aff. ¶¶ 7–10; Perskie Aff. ¶ 10; Sicari Reply Aff. ¶¶ 17–18; J. Seelig Reply Aff. ¶ 9; Hilteb-

rand Reply Aff. ¶¶ 15–16; Hanlon Dep. 24:2–25:4, 50:25–51:20, 52:2–24; McKoy Dep. 25:19–26:1; Sutor Dep. 22:11–19.

Between 1978 and 1980, A.C. Coin had distributed reel slot machines manufactured by a company known as Jennings Manufacturing ("Jennings"). Seelig Reply Aff. ¶ 3. Sometime thereafter and until 1982, A.C. Coin distributed reel slot machines made by a company called Gamex. *Id.* These two manufacturers were not truly competitors of IGT because of the difference in their product lines. *Id.* The transition from Jennings and Gamex to IGT was not as difficult as was the transition from Jennings to Gamex because IGT's product line was limited to video poker and Gamex was not a true competitor of IGT. *Id.* ¶ 5. Moreover, the transfer of physical assets and employees from Gamex to IGT was not an issue in 1983 when A.C. Coin and IGT first began their relationship. *Id.* ¶ 6. At that time, A.C. Coin's office was located in Mac Seelig's home. *Id.* A.C. Coin had a small warehouse, two small forklifts, two service vehicles, four technicians, one bookkeeper, and one secretary. *Id.* There is a substantial difference in A.C. Coin's physical assets and work force such that the nature of any potential transition from IGT to another manufacturer would not be nearly as simple.

Indeed, IGT's former president and CEO, David Hanlon, testified that it would be difficult, if not impossible, for A.C. Coin to transfer its good will and reputation from IGT to a different product line because Mac Seelig was such an extremely vocal proponent of IGT and the quality of IGT's products. Hanlon Dep. 24:2–25:4. He analogized the difficulty as follows: "[I]f you're selling a Chevrolet for a number of years and it's the best car in the world, and suddenly you're selling a Ford the next day, there is some credibility issue there." *Id.,* 50:25–51:20.

Even if A.C. Coin were able to distribute another manufacturer's slot machine or if the customers were willing to give A.C. Coin a "shot," as some Atlantic City executives have suggested, there is no guarantee that these

---

**17.** Indeed, Seelig admitted as much to IGT president G. Thomas Baker during a phone conversation which, unbeknownst to IGT, was taped by Seelig. IGT Exh. 2 at 24211.

casinos would actually purchase those products any time soon. Sutor Dep. 57:20–24; Tjoumakaris Dep. 138:5–13; Jonas Dep. 44:16–45:13, 46:6–17. A.C. Coin has no other deals lined up to replace IGT as a customer. Once the current 1993 Agreement between the parties expires, A.C. Coin loses its ability to sell, distribute, and service IGT slot machines, with no slot machine manufacturer of comparable prestige to fill the void.

Tjoumakaris, the Caesars executive, testified that Caesars would not simply buy any product outright that A.C. Coin had to offer without finding out exactly what the product is capable of producing in terms of revenue. Tjoumakaris Dep. 138:5–13. Dave Jonas, of the Showboat, testified in similar fashion:

Q: Well, let me ask you this: You testified earlier that I believe it was 70 percent of your casino floor is comprised of I.G.T. machines?

A: At least.

Q: How much of your floor is comprised of Bally machines?

A: It's less than 15 percent. The only reason we have any is because the law required us to have Bally machines as of a couple of years ago. As quickly as I can get them out of here is how I'm—how we're proceeding right now.

Q: So if A.C. Coin, Mr. Seelig, or any representative of A.C. Coin came to you after their agreement with I.G.T. expires and tries to sell you, say, a Bally product -

A: Well—

Q: Would you—let me finish the question—would you have a problem purchasing that Bally product because of your testimony that you're trying to get Bally products off your floor?

A: I would not purchase any Bally product that either A.C. Coin or Bally could demonstrate to me was better than what I already have on the floor, unless it was substantially better than what I have out there right now. Jonas Dep. 44:16–45:13.

\*    \*    \*    \*    \*    \*

Q: Following your answer, then, would it be safe to assume that A.C. Coin, Mac Seelig or any of the representatives would have a very difficult time trying to convince you now after selling I.G.T. products to you for 15 years that this Bally machine—this is the greatest thing since sliced bread? ...

A: They would have their work cut out for them.

Q: In your view, would they have credibility problem trying to establish the Bally machine is better than the I.G.T. machine?

A: Only because the product is clearly not at this point. Jonas Dep. 46:6–17.

\*    \*    \*    \*    \*    \*

Q: There was some discussion a few moments earlier about whether or not there would be a credibility problem if A.C. Coin were to be the distributor for another manufacturer. So that I am absolutely clear, is it fair to say that, *assuming we have equally attractive products* to the customers from—by one manufacturer in comparison to another, that there would be no credibility problem, in your mind, in dealing with Mac Seelig and A.C. Coin as a distributor for another manufacturer other than IGT?

A: None.

Q: So the answer to my question is yes, you would have no credibility problems?

A: There would be no credibility problem. Jonas Dep. 48:15–49–2 (emphasis added). At this point in the industry, IGT products are clearly superior.

Some of these same executives have testified that they would be willing to entertain other proposals if Mac Seelig was involved. For instance, Sutor testified: "A couple of weeks ago Mac said that he was looking at the possibility of doing a business relationship with another slot machine manufacturer, someone who could have systems games, and that's very attractive to me and to the industry, to have a system compete with I.G.T.'s systems. I like competition." Sutor Dep.

54–55. He further added that if a system was offered through A.C. Coin, he would have no difficulty purchasing it simply because Mac Seelig had once been associated with IGT. *Id.* at 58–59. C. Patrick McKoy, Senior Executive Vice President of the Atlantic City Hilton similarly stated that they would have no problem dealing with A.C. Coin as a distributor of another manufacturer's machines. McKoy Dep. 15–17. Showboat's Jonas also stated that he would have the same high regard for A.C. Coin in the future if it became the distributor for another manufacturer. Jonas Dep. 45–50.

This testimony is mirrored by Paul Tjoumakaris of Caesars: "I think he [Mac Seelig] could influence me to give it a shot because of our relationship, because of his support, and if some new manufacturer, for example[,] happens to be in town, he's a distributor of it, he'll probably get a crack at it. . . ." Tjoumakaris Dep. 134–135.

Presently none of these executives have extended to A.C. Coin any firm offer of business comparable to that of IGT. They all speak in terms of future possibility rather than concrete willingness. To the extent that these executives have testified that they would be willing to entertain another relationship involving another manufacturer's gaming machines, when IGT's are clearly recognized as superior within the industry, and where it would be less expensive to deal directly with IGT rather than through the extra conduit of a distributor, their testimony is not credible.

Mac Seelig has stated publicly that A.C. Coin's businesses not covered by the 1993 Agreement, together with any other possible post-IGT distributorships, will allow his company to remain viable. In a telephone conversation with IGT President G. Thomas Baker, which Seelig himself recorded after receiving notice of IGT's non-renewal, he stated that because of his "other business in the area," he is not going to "dry up [and] blow away." Defs.' Exh. 2 to IGT Br. at AC 24209. Mac Seelig also admitted in his deposition testimony that he told a reporter for the *National Gaming Summary* trade publication that he "believes his company, which started off with four employees and now has more than 120, will continue to grow, *with or without IGT* . . . ." Exh. 8 to IGT Br. (emphasis added). He also testified that he was not lying when he told that reporter: "We see this nonrenewal of the 1993 Agreement as a chance to reach the next level . . . It will open up a world of new opportunities for us." *Id.; see also* Seelig Dep. v.1 223–24.

### III. Conclusions of Law

#### A. The Standard for Preliminary Injunction

■ The standard for the granting of a preliminary injunction in the Third Circuit is well settled. The movant must show: (1) a reasonable probability of ultimate success on the merits; (2) that the movant will be irreparably injured (or "harmed") if relief is not granted; (3) that the relative harm which will be visited upon the movant by the denial of injunctive relief is greater than that which will be sustained by the party against whom relief is sought; and (4) the public interest in the grant or denial of the requested relief, if relevant. *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir.1992) (reversing trial court denial of franchisor's request for preliminary injunction); *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987).

#### B. Success on the Merits

The "success on the merits" prong is undoubtedly the injunction element upon which the New Jersey Franchise Practices Act exerts the most influence (*see also* the "public interest" section, *infra,* at III(E)). As such, in order to determine whether plaintiffs will likely succeed on the merits, the Court must review the purposes and requirements of the Act and apply them to the facts found above. At this very early stage of the case, on an application for injunctive relief, the movant need only "make a showing of reasonable probability, not the certainty, of success on the merits." *SK & F Co. v. Premo Pharm. Lab., Inc.,* 625 F.2d 1055, 1066 (3d Cir.1980); *Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir. 1975); *Central Jersey Freightliner, Inc. v. Freightliner Corp.,* 987 F.Supp. 289, 295 (D.N.J.1997) (plaintiffs need not "demon-

strate that their entitlement to a final decision after trial is free from doubt").

■ The elements required to find a franchise under the Act include: (1) a "community of interest" between the franchisor and the franchisee; (2) the franchisor's grant of a "license" to the franchisee; and (3) the parties contemplation that the franchisee would maintain a "place of business in New Jersey." *N.J.S.A.* §§ 56:10–3a, –4. Prompted in large measure by the practices of automobile manufacturers and major oil companies, the New Jersey Legislature enacted the NJFPA in 1971. *See Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 614 A.2d 124, 132 (1992) (hereinafter "*ISI* "). The Act was designed to protect against indiscriminate termination by providing that "it shall be a violation of this act for a franchisor to terminate, cancel, or fail to renew a franchise *without good cause.*" *N.J.S.A.* § 56:10–5 (emphasis added). The Act has been interpreted to cast a broader net to encompass more diverse business relationships than the prototypical franchise situation such as a car dealership or fast food restaurant. *ISI*, 130 N.J. at 350, 614 A.2d 124.

Generally speaking, the Act does not protect all franchisees. It instead

applies only to a franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise.

*N.J.S.A.* 56:10–4.

Noteworthy is the NJFPA's requirement that a franchise be terminated only for "good cause"—that is, the failure of the franchisee substantially to comply with the requirements of the franchise agreement. *General Motors Corp. v. Gallo GMC Truck Sales, Inc.*, 711 F.Supp. 810 (D.N.J.1989) (Rodriguez, J.).

This bill gives neither the franchisor nor franchisee the upper hand. What it does, however, is to prevent arbitrary or capricious actions by the franchisor who generally has vastly greater economic power than the franchisee . . .

We do not say that a franchisee is entitled to his franchise under all circumstances. If he is not doing the job required of other franchisees in similar circumstances, we agree that he should stand to lose his franchise. But if he is meeting reasonable and non-discriminatory standards, he should have the full right to retain the privileges that go with the franchise. A–2063 is based on this premise.

*Hearing on Bill 2063 Before the New Jersey Assembly Judiciary Committee,* Mar. 29, 1971 (statement of Charles W. Davis, Exec. Vice President of New Jersey Hotel/Motel Assoc.), at 1. It is a violation of the Act, therefore, to cancel a franchise for any reason other than the franchisee's substantial breach, even if the franchisor acts in good faith and for a bona fide reason. *Westfield Centre Serv., Inc. v. Cities Serv. Oil Co.*, 86 N.J. 453, 469, 432 A.2d 48, 55 (1981).

Good cause supporting a termination in the case at bar is noticeably absent. IGT has presented no evidence that A.C. Coin was inadequate in its duties under the 1993 Agreement. There are no allegations of wrongdoing justifying termination. Rather, there is nothing but praise from IGT in the very letter from G. Thomas Baker, IGT's President, which sparked this litigation:

. . . Mac, it is especially important to clarify that IGT has enjoyed a professional relationship with Atlantic City Coin & Slot Service Company. Our company believes that ACCS has acted not only in its best interest but also in IGT's best interest in New Jersey as well as the other territories covered by our distributorship agreement. Many of us at IGT have also enjoyed a professional and personal relationship with you, your family and your employees. These issues are not in question.

However, as you know our distributorship agreement expires on June 12, 1998. IGT is a much different company today than it

was when it entered into a business relationship with you over 14 years ago. After reviewing all of our options in New Jersey, taking into consideration numerous factors, we have concluded that IGT should assume the responsibilities currently contracted to ACCS in New Jersey, Maryland and the Caribbean Islands. *This is a business judgment made by the management team at IGT,* and it is a judgment in which I concur ...

... I sincerely hope that upon reflection you will understand that this is a decision that IGT has made *in the interests of its shareholders ....*

Baker Letter of Sept. 3, 1997 (emphasis added). Recognizing the mutual benefit built up over the years between the two companies, Baker's letter does not constitute what is traditionally known as good cause.

*(1) Community of Interest*

■ The NJFPA requires a franchisee to show that it has a "community of interest" with a franchisor. *N.J.S.A.* § 56:10–3a. As the New Jersey Supreme Court has explained:

Community of interest exists when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skills that will be of minimal utility outside the franchise.

*ISI,* 130 N.J. at 359, 614 A.2d 124 (quoting *Cassidy Podell Lynch v. SnyderGeneral Corp.,* 944 F.2d 1131, 1143 (3d Cir.1991)). To find a "community of interest," then, two requirements must be met: (1) the distributor's investments must have been substantial franchise-specific investments and (2) the distributor must have been required to make these investments by the parties' agreement or the nature of the business. *Id.; N.J.S.A.* § 56:10–3a.

Arguably the most central dispute in this case is which precedents are to be accorded greater persuasive weight in construing the Act's elements—federal case law from the Third Circuit or that of New Jersey courts construing their own state law. For the following reasons, the Court finds the latter to be more persuasive.

■ It goes without saying that a federal court sitting in diversity must apply, and give appropriate deference to, the substantive law of the state in which it sits. *See generally Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In so doing, a federal court must first turn to the construction given to statutes as applied by the highest state court—in this case, the New Jersey Supreme Court. The story of federal case law interpreting the Franchise Practices Act for most of the past ten years has been one of prediction, in the absence of a definitive New Jersey court ruling giving life to the Act's statutory language. It is these cases upon which IGT places primarily reliance.

■ IGT contends that the appropriate test for whether A.C. Coin has satisfied the "community of interest" requirement was first set forth in *Colt Indus. Inc. v. Fidelco Pump & Compressor Corp.,* 844 F.2d 117 (3d Cir.1988). In *Colt,* Judge Higginbotham, writing for the panel majority, appropriately looked to the leading case on the Act available at the time, *Neptune T.V. & Appliance Serv., Inc. v. Litton Microwave Cooking Prods. Div. Litton Sys., Inc.,* 190 N.J.Super. 153, 462 A.2d 595 (App.Div.1983) (Pressler, J.). In an effort to give meaning to the then largely undefined "community of interest" requirement, the majority stated that, "Courts analyzing whether an alleged franchisee is part of the class that is protected by the Act have looked for specific proof, focusing on certain *indicia of control* by the supposed franchisor over the supposed franchisee." *Colt,* 844 F.2d at 120 (citing *Neptune T.V.,* 190 N.J.Super. at 163–64, 462 A.2d 595) (emphasis added). In affirming the district court's finding of no indications of interdependency or control between Fidelco and Colt, and that the relationship was a cooperative one, *Colt Indus., Inc.,* 700 F.Supp. 1330 (D.N.J. 1987), the Court of Appeals concluded:

Indeed, the factual record before the district court seemed to indicate that the relationship was one of equal bargaining power and reflected two parties engaged in

the common pursuit of a shared goal. The sales meetings at Fidelco's locations and the advertising and promotional materials, for example, demonstrated no more than cooperation in selling compressors. These sales meetings were not mandatory training for Fidelco's employees, nor was there a Colt-mandated method for selling the product. In addition, the advertising and promotional materials provided to Fidelco by Colt were only suggested, not required ... In sum, Fidelco failed to establish that it *was subject to the whim, direction and control of a more powerful entity whose withdrawal would shock a court's sense of equity.*

*Id.* (emphasis supplied).

In dissent, Judge Rosenn began by noting that, sitting in diversity, the court should apply New Jersey law. *Colt*, 844 F.2d 117, 121 n. 1 (3d Cir.1988) (Rosenn, J., dissenting). Quoting the *Neptune T.V.* court, Judge Rosenn stated that a franchise relationship is:

[B]ased on the complex of mutual and continuing advantages which induced the franchisor to reach his ultimate consumer through entities other than his own which, although legally separate, are nevertheless economically dependent upon him.

*Id.* at 124 (citing *Neptune T.V.*, 462 A.2d at 601). The dissent then went on to fault the majority and the district court below for supporting their holdings in part with *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672 (2d Cir.1985), a Second Circuit opinion construing the *Connecticut* Franchise Act. *Colt*, 844 F.2d at 124. The *Grand Light* court, as pointed out by the *Colt* dissent, recognized the dangers inherent in overextending the scope of the Connecticut Act and thus reasoned that the franchisor's "control" of the franchisee is the essential precondition of the franchise relationship. *Id.* (citation omitted). Among the indicia of control noted by the *Grand Light* court were the "franchisor's auditing of books and inspection of premises, control of lighting, employee uniforms, prices, trading stamps and hiring, establishing of sales and management training and financial support." *Id.* (citation omitted).[18] Judge Rosenn continued:

[N]othing in either the New Jersey Act or in *Neptune* itself contemplates the degree of franchisor control adopted by the majority in the present case. The New Jersey Act simply does not contain language comparable to Connecticut's requirement that a franchisee adopt a 'marketing plan or system prescribed in substantial part by a franchisor.' Moreover, *Neptune*'s 'mutual advantage' standard requires a franchise relationship characterized by interdependence rather than by control. Thus, rather than sanction adoption of the control test, *Neptune*'s reference to 'unconscionable loss' merely reflects the appellate division's recognition that a franchisee is generally reliant upon a franchisor for its economic well being.

*Id.* at 125. As the dissent noted, the Connecticut Act, unlike its New Jersey counterpart, contained no "community of interest" requirement. *Id.* at 124. As such, the court's adoption of the "control" test constituted an error of law. *Id.*

The Third Circuit's general uneasiness—in the absence of a New Jersey Supreme Court ruling—with its formulation of the Act's "community of interest" requirement was evident less than a year later in *New Jersey American, Inc. v. The Allied Corp.*, 875 F.2d 58 (3d Cir.1989) (Becker, J.). In dicta, the court candidly remarked:

---

**18.** Along with IGT's assertion in the case at bar that there was no unequal bargaining power during their contract renegotiation sessions, IGT claims that it never imposed sales quotas and thus lacked the requisite control over A.C. Coin to warrant coverage under the Act. As the Court has found above, however, there were sales quotas of a certain kind at one time. Whether they have continued is unclear and the Court expresses no opinion on this issue. With regard to the "unequal bargaining power" aspect of the "community of interest" inquiry, this Court does not read the cases to deal specifically with the actual nature, content, and practices of the parties' contractual negotiation sessions. While Judge Becker in *New Jersey American v. The Allied Corp.*, 875 F.2d 58, 65 (3d Cir.1989) mentions "bargaining power" at the time the parties enter the contract, *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 614 A.2d 124 (1992)("*ISI*"), discussed at length *infra*, does not pick up on this theme.

The problem is further complicated by the focus of the Act on the agreement between the parties: the test for inequality of bargaining power must operate at the time of the agreement, although the real problem in the franchise relationship is the potential for abuse after the franchisee has devoted considerable resources to the franchisor's business. We have dealt with this problem by focusing on whether the agreement between the licensee and licensor contemplates such future investment. That approach, to some extent, fudges the issue, but in the absence of guidance from the New Jersey courts, we are unable to devise an approach that better effectuates what we believe to be the purposes underlying the Act.

*Id.* at 65. A subsequent Third Circuit case, *Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.*, 944 F.2d 1131, 1139–41, 1143 (3d Cir. 1991), relied on by defendants, similarly applies the "control" standard set forth in *Colt*. That court, too, indicated that the New Jersey Supreme Court had yet to define the community of interest element. *Id.* at 1140. In *Cooper Distributing v. Amana Refrigeration*, 1992 U.S. Dist. LEXIS 17918, *9 n. 4 (D.N.J. Jan. 23, 1992) ("*Amana I*"), Judge Barry anticipated that the New Jersey Supreme Court's ruling following its grant of certification of *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 243 N.J.Super. 53, 578 A.2d 876 (App.Div.1990), "will put some meat on the Act's comparatively bare bones."

Later that same year, the New Jersey Supreme Court spoke definitively on the Act in *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 614 A.2d 124 (1992) ("*ISI*"), and reversed the Appellate Division's finding that no franchise existed between the litigating parties because the alleged franchisee had not satisfied the "license" requirement. *Id.*, 130 N.J. at 328, 614 A.2d 124. The court took the opportunity to construe not only the license element of the Franchise Act inquiry, but also the Act's other requirements.

While the *ISI* court recognized generally that the community of interest requirement was designed to address the inequality of bargaining power typical of a franchise relationship, and of the "vulnerability of the franchisee to an unconscionable loss of his tangible and intangible equities," *id.*, 130 N.J. at 356, 614 A.2d 124 (citing *Neptune T.V.*, 190 N.J.Super. at 165, 462 A.2d 595), the *ISI* decision is noteworthy not only for what it says but also for what it does not say. Nowhere in the court's community of interest inquiry does it specifically adopt anything resembling the "control" test superimposed on the Act by earlier federal decisions. Although IGT seems to assert that the *ISI* court relied on *Cassidy*, 944 F.2d at 1143, in its formulation of the appropriate standard, the *ISI* court mentions *Cassidy* only as "echoing" *Neptune T.V.*'s views of the "broad, elastic and elusive" concept of community of interest as reflecting a "symbiotic character of a true franchise arrangement and the consequent vulnerability of the alleged franchisee to an unconscionable loss of his tangible and intangible equities." *ISI*, 130 N.J. at 359, 614 A.2d 124 (citing *Neptune T.V.*, 190 N.J.Super. at 165, 462 A.2d 595). The *ISI* court quotes *Cassidy* mainly for the following proposition: "[C]ommunity of interest exists when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skill that will be of minimal utility outside the franchise." *Id.* (citing *Cassidy*, 944 F.2d at 1143).

To be entirely complete, the *ISI* court, in distinguishing the business relationship among the litigants before it from that which existed in *Colt*, mentioned that in *Colt* "the purported franchisee had a non-exclusive distributorship and *was subject to little or no control by the manufacturer.*" *Id.* at 366, 614 A.2d 124. Yet the mere mention of the word "control" *does not an element of the* "*community of interest*" *test make*, particularly in light of its being buried deep in the *ISI* court's lengthy and fact-sensitive analysis of the ISI–CCC relationship. The *ISI* court's quiet avoidance of the "control" test as first adopted by *Colt* is also apparent in *Cooper Distributing Co., Inc. v. Amana Refrigeration*, 63 F.3d 262 (3d Cir.1995) ("*Amana II*"), a case determining the substantive

merit under the Act of the plaintiff's cause of action, following the entry of a jury verdict and court judgment. *Id.* at 265. Conspicuously absent from the *Amana II*'s "community of interest" analysis is any inquiry under the *Colt* "control" test. Contrary to IGT's contention, then, pre-*ISI* cases cannot be deemed by this Court to be the more controlling authorities on interpretation of the Act.

As recounted in the Court's findings above, A.C. Coin has made numerous franchise-specific investments which were necessary given the nature of the business relationship. Such activity on behalf of IGT has caused casino executives to view IGT and A.C. Coin as having worked "hand in glove," and "interdependently." Sutor, Vice President of Finance of Caesars, summed it up best: "*I mean, if you think about buying I.G.T. slot machines, I could picture Mac's [Seelig's] face ... So they're almost synonymous.*" Sutor Dep. at 50:14–22 (emphasis added).

Looking to the *ISI* decision, the relationship between IGT and A.C. Coin has sufficient hallmarks of a "community of interest" such that A.C. Coin enjoys a reasonable probability of success on the merits. With regard to the franchise-specific investment requirement by the alleged franchisee, the *ISI* court noted that the franchisee there had purchased, in terms of tangible capital assets, the following: office facilities, 130 N.J. at 357, 614 A.2d 124; specialized computers to demonstrate software and programs, *id.* at 363, 614 A.2d 124; promotional products, *id.;* signs bearing the manufacturer's name, *id.* at 357, 614 A.2d 124; and computer upgrades, *id.* at 363, 614 A.2d 124. The *ISI* franchisee had also maintained inventories. *Id.* at 357, 614 A.2d 124.

In the case at bar, A.C. Coin has purchased all of the above (Seelig Aff. ¶¶ 29, 35, 69, 76, 80). In addition, A.C. Coin has invested in a marketing facility modified and expanded to sell, service, and modify IGT products. *Id.* ¶¶ 67, 70. Specifically, this facility includes a specialized security system and IGT license copying room, "signage" and glass areas, repair areas, a show room, and inventory control system. *Id.* While IGT claims that theoretically such investments are transferable, there is presently no other IGT competitor to which A.C. Coin could devote such a significant volume of facility space and hardware. Instead of the specialized computers to demonstrate software and programs purchased by the *ISI* franchisee, A.C. Coin has comparably purchased IGT showroom models for demonstrations to customers. *Id.* ¶ 71. Significantly, A.C. Coin has gone beyond what the *ISI* franchisee had done in terms of tangible franchise-specific investments in other ways. A.C. Coin has purchased IGT service manuals, *id.*, stationery, *id.* ¶¶ 29, 80, and has leased additional warehouse space on which it must pay rent.[19]

In finding a community of interest, the *ISI* court also found that the franchisee had made intangible franchise-specific investments such as installing a base of clients which would have been lost in the event of termination, *ISI*, 130 N.J. at 363–64, 614 A.2d 124, and conducting customer studies assessing the product in question. Likewise, A.C. Coin has developed a client base for IGT at Atlantic City's casinos, which base it did not have when it entered into its first contract with A.C. Coin in 1983. Seelig Aff. ¶ 38. It has been advertised as IGT's exclusive distributor. *Id.* ¶ 73. A.C. Coin also points to a litany of other intangibles which are over and above what was accomplished by the *ISI* franchisee. A.C. Coin also used IGT-provided promotional materials. *Id.* ¶¶ 17, 30. It has formed special divisions to address specific customer needs not adequately handled by IGT on the manufacturing end of production, such as inventory and glass divisions. *Id.* ¶¶ 32–35. A.C. Coin has provided seven-day-per-week, 24–hour service on IGT's machines in Atlantic City, *id.* ¶ 43, accepted trade-ins of outdated IGT machines, *id.* ¶ 25, and repaired and corrected manufacturing defects for customers, *id.* ¶¶ 40–43. In its promotion of IGT's name

---

**19.** The Court also notes that A.C. Coin established an office in Puerto Rico. While it is sensible on one level for A.C. Coin to have made efforts and investments to staff that office following IGT's granting A.C. Coin the right to act on its behalf in this venue, the Court reserves on the question of whether this is a franchise-specific investment attributable to A.C. Coin's New Jersey business, given the Act's New Jersey "place of business" requirement.

and products, A.C. Coin has made franchise-specific investments which are not transferable to other manufacturers, such as their past hosting of special customer and charitable events, *id.* ¶¶ 58, 62–65, and importantly, their lobbying efforts on IGT's behalf, *id.* ¶ 77. Many of these past activities were required by A.C. Coin's contract with IGT and cannot benefit of any future manufacturer A.C. Coin could potentially acquire as a customer. IGT's reputation and its place in the market are already established.

While the *ISI* court did not adopt the "control" test as formulated in *Colt*, it did view the relationship before it as one where the franchisee was required under its contractual obligations to perform certain functions. In *ISI*, the franchisor, CCC, required ISI to use promotional materials, 130 N.J. at 365, 614 A.2d 124, maintain adequate facilities, *id.*, and submit sales reports, *id.* A.C. Coin has been required by IGT to do the same. *See* Seelig Aff. ¶¶ 16,17,18, 30, 84, 86. In *ISI*, the franchisee had to ensure that all efforts be directed to developing demand for the manufacturer's product. 130 N.J. at 365, 614 A.2d 124. The same holds true for A.C. Coin. Seelig Aff. ¶ 17. The franchisor in *ISI* similarly imposed competitive restraints, 130 N.J. at 365, 614 A.2d 124, required that the alleged franchisee use its "best efforts," *id.* at 328, 353, 614 A.2d 124, required the training and education of customers, *id.* at 353–54, 614 A.2d 124, retained a right to monitor financial performance and review company books, *id.* at 365, 614 A.2d 124, and required the franchisee to maintain a minimum number of sales representatives, *id.* at 364, 614 A.2d 124. A.C. Coin was required to work under similar constraints, *see* Seelig Aff. ¶¶ 17, 23–24, 84, 89, and to hire two IGT employees, *id.* ¶ 7. Beyond what was described in *ISI*, A.C. Coin followed IGT guidelines regarding communications with IGT, *id.* ¶ 83, used IGT supplied order and service forms, *id.* ¶ 84, paid all costs related to licensing, governmental investigation and approvals, *id.* ¶ 8, and provided trademark use reports, *id.* ¶ 85. Like the franchisee in *ISI*, which had to satisfy certain quality standards, A.C. Coin had to abide by similar rules with respect to the use of IGT's logo and the duplication and burning of Eproms,[20] 130 N.J. at 365, 614 A.2d 124, Seelig Aff. ¶ 85. In both cases, the alleged franchisees' employees were trained by the manufacturer. 130 N.J. at 365, 614 A.2d 124; Seelig Aff. ¶¶ 23–24.

The *ISI* court also focused on the economic dependence of the alleged franchisee claiming the existence of a franchise. It found that 97 percent of that company's revenue derived from the sale of the manufacturer's products, 130 N.J. at 365, 614 A.2d 124, that there was no alternate product line available, *id.* at 363, 614 A.2d 124, and, in addition to a "best efforts" requirement, *id.* at 328, 353, 614 A.2d 124, that competitive restraints had been imposed, *id.* at 365, 614 A.2d 124. A.C. Coin claims that approximately 76 percent of its revenues derive from the sale, lease, and servicing of IGT products. Seelig Aff. ¶¶ 47, 88.[21]

Finally, *ISI* addressed the "interdependence" of the parties before it. In that case, the New Jersey court found joint cooperation in resolving maintenance problems, 130 N.J. at 365, 614 A.2d 124, joint representation at educational conventions, *id.*, and joint cooperation in sales and marketing activities, *id.* In this case, A.C. Coin has done the same and more. It has corrected engineering problems and serviced manufacturing defects, Seelig Aff. ¶¶ 40–43, engaged with IGT in joint promotional activities and special events, *id.* ¶¶ 23, 54, and conducted joint

---

20. Specifically, *see* March 7, 1994 IGT Interoffice Correspondence from B. Russell of IGT, accompanying Corporate Logo Standards Manual, and March 15, 1994 Memorandum from D. Sadler of IGT, accompanying Eprom policies and procedures, Exh. 54 to Seelig Aff. The Court has reviewed these documents, and while it is apparent that IGT had procedures designed to be followed by A.C. Coin with regard to Eproms, it is not immediately apparent from the context what Eproms are.

21. IGT has contended that this 76 percent figure is inflated. The Court finds this assertion irrelevant in light of the Act's minimal requirement that the franchisor's business be at least 20 percent of the franchisee's livelihood. IGT has not contended that A.C. Coin's reliance on its products falls below the 20 percent threshold, or that A.C. Coin's IGT-related business totals under $35,000.

product demonstrations, training sessions, and customer focus groups, *id.* ¶¶ 24, 51. The two companies have also jointly introduced gaming devices and worked to perfect new progressive games. *Id.* ¶¶ 50–51. Finally, A.C. Coin has worked to protect IGT's name and reputation. *Id.* ¶¶ 38–45.

For purposes of satisfying the preliminary injunction requirement that the movant demonstrate a reasonable probability of success on the merits, the Court concludes that based on the record before it, the above examples of franchise-specific investment, which were required to be made and which were necessary to the conduct of the business, are sufficient for plaintiffs to meet their burden.

### (2) License

■ Before a party may be deemed a "franchisee" subject to the Act's protections, it must show that it has been granted "a license to use a trade name, trade mark, service mark, or related characteristics." *N.J.S.A.* § 56:10–3a. The New Jersey court has explained that "the Act's 'license to use' requirement does not encompass a definition of license in the word's broadest sense, that is: permission to do something [that] without the license would not be allowable." *ISI,* 130 N.J. at 352, 614 A.2d 124 (citations omitted). Simply because a franchisee is permitted to use the franchisor's insignia, an act that would normally "not be allowable" under trademark laws, does not in itself create a license. Otherwise, "any business selling a name brand product would, under New Jersey law, necessarily be considered as holding a license." *Id.* (quoting *Colt,* 844 F.2d at 120).[22] Instead, the meaning of "license" is more narrowly defined under the Act. It means "to use as if it is one's own. It implies a proprietary interest...." *Finlay & Assoc., Inc. v. Borg–Warner Corp.,* 146 N.J.Super. 210, 369 A.2d 541, 546 (Law Div.1976), *aff'd on other grounds,* 155 N.J.Super. 331, 382 A.2d 933 (App.Div.), *certif. denied,* 77

N.J. 467, 391 A.2d 483 (1978).[23] The mere furnishing of advertising materials as contemplated by a distributorship agreement, and allowing a plaintiff to have its name placed on certain items if it so desires as advertising for itself, does not satisfy the Act. *Id.* at 219, 369 A.2d 541. The *Finlay* court further explained that "[t]he trademark, tradename reference means and implies use of that name in the very business title of the franchisee and a holding out or perhaps representation to the public of some special relationship or connection." *Id.* Merely selling goods or distributing materials bearing the manufacturer's name or trademark does not "license" use of the "trademark." *Id.* New Jersey's Appellate Division has further explained:

> At a minimum, the term 'license' means that the alleged franchisee must use the name of the franchisor 'in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the ... licensor and the licensee by which the licensor vouches, as it were, for the activity of the licensee.'

*Neptune T.V.,* 190 N.J.Super. at 160, 462 A.2d 595 (noting that hallmark of a license is that the franchisor gives its approval to the franchisee's business enterprise with regard to the franchisor's product such that the public is induced "to expect from [the franchisee] a uniformly acceptable and quality controlled service endorsed by [the franchisor] itself") (cited in *ISI,* 130 N.J. at 354, 614 A.2d 124). While the *ISI* court declined to adopt the requirement that the franchisee be the alter ego of its franchisor, it noted:

> Even were we to seek an alter-ego standard for the franchise-license requirement, the record is replete with evidence that such a merger of identity actually existed. ISI's reputation throughout the Northeast has always been exclusively as a CCC distributor. *ISI,* 130 N.J. at 355, 614 A.2d 124.

---

**22.** While the Court has stated that *ISI* controls, to the extent that this decision quotes or relies on federal case law for propositions relevant to the franchise inquiry, the Court will do the same.

**23.** The Court similarly views the *Finlay* and *Neptune T.V.* favorably and as persuasive to its inquiry under the Act because these cases heavily informed the *ISI* court in its construction of the Act.

In finding a license in *ISI*, the court highlighted the contractual language requiring ISI to " 'use its best efforts to maintain and promote CCC's name, trademark and logo on the Products' " and prohibiting it from selling, developing, or designing any products competing with CCC. *Id.* at 353–54, 614 A.2d 124, (emphasis deleted). Another aspect found important to the *ISI* court was the requirement that the franchisee educate and train customers. 130 N.J. at 354, 614 A.2d 124. A.C. Coin, too, trains its customers. Seelig ¶¶ 23–24.

Above and beyond A.C. Coin's employees' wearing of name tags, and the display of IGT signs and logos on almost everything identified with A.C. Coin, IGT's end product which reached customers have an identity integrally related to A.C. Coin. In *ISI*, defendant's computerized educational learning system was not characterized as an " 'off-the-shelf' product that could be purchased at the neighborhood appliance store," but a "unique combination of hardware and software whose identity is integrally related with that of ISI." *Id.* IGT's slot machines were not directly "off the shelf." Indeed, A.C. Coin has submitted credible evidence that A.C. Coin and IGT have customized machines for customers, and A.C. Coin has completed unfinished IGT machines. Seelig Aff. ¶¶ 32, 34. Rather, their success on the gaming floors of Atlantic City was, and has been, the result of a combination of IGT's manufacturing and A.C. Coin's own modifications, improvements, and exploitation.

The *ISI* court further noted that the ISI–CCC relationship was characterized by certain other incidents worthy of protection under the Act. For instance, the court found that the franchisee was granted an express right to use the franchisor's name and trademark, 130 N.J. at 353, 614 A.2d 124, a "best efforts" requirement, *id.;* a prohibition on the development and sale of competitive products, *id.,* and exclusive distributorship granted, *id.* at 329, 354, 614 A.2d 124; a public perception that the two companies were synonymous, *id.* at 355, 614 A.2d 124;

that the franchisee had a regional reputation as the franchisor's exclusive distributor, *id.* at 354, 614 A.2d 124; and that the franchisor/manufacturer had promoted the franchisee as its exclusive distributor; *id.* at 355, 614 A.2d 124. These aspects of A.C. Coin's business are discussed above in the Court's findings.

By virtue of the 1993 Agreement, A.C. Coin is explicitly authorized to use IGT's trade marks. In just about every advertisement and at every promotion, both A.C. Coin's and IGT's logos appear together. The statements from Atlantic City casino executives suggest that A.C. Coin has shown that it stands a reasonable probability of ultimately proving that its customers reasonably perceive a connection between IGT and A.C. Coin. Similarly, IGT's past statements in trade publications and advertisements noting that A.C. Coin is its New Jersey distributor suffices to show at this stage of the proceedings that IGT has "vouched" for A.C. Coin's activities.

Based on the factual findings made above, the Court concludes that A.C. Coin has provided sufficient evidence at the preliminary injunction stage that it, too, is worthy of a characterization similar to that accorded to the franchisee in *ISI*.[24]

### (3) New Jersey Place of Business

The NJFPA applies only to an agreement "the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey." *N.J.S.A.* § 56:10–4. The NJFPA defines "place of business" as:

> a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services. Place of business shall not mean an office, warehouse, a place of storage, a residence or a vehicle.

*N.J.S.A.* § 56:10–3(f). In *ISI*, for instance, the New Jersey Supreme Court, in finding that plaintiff franchisee's facility was a place

---

**24.** *See* Seelig Aff. ¶¶ 4–5, 12–15, 16, 17, 27, 28, 29, 38, 49, and specific citations to 1993 Agreement provisions above.

of business, noted that plaintiff ISI "ha[d] been giving more than one hundred demonstrations a year" at that facility, *ISI*, 130 N.J. at 350, 614 A.2d 124, and that ISI had used the facility to acquaint prospective purchasers with the functioning of its product. *Id.* ISI's only business location was a 6,000–square–foot facility on the sixth floor of a commercial office building in Hackensack, New Jersey. 130 N.J. at 350, 614 A.2d 124. ISI specifically constructed its facility so that its franchisor's products could be demonstrated and instruction given to customers. The Act requires a sales location in New Jersey; mere distribution through an office of warehouse is insufficient. *Id.* at 349, 614 A.2d at 137 (quotation omitted).

IGT does not seriously contest that A.C. Coin has maintained a New Jersey place of business. Anyone buying IGT slot machines in Atlantic City—the casinos—had to buy them at A.C. Coin's Pleasantville, New Jersey location. Indeed, in the 1993 Agreement, IGT specifically admits that A.C. Coin's Atlantic City facility is satisfactory. See lig Aff., Exh. 6, 1993 Agreement, § L.

### C. Irreparable Harm

■ Having determined the legal aspects of this case—whether A.C. Coin has made a threshold showing under the Act, the Court turns to the equitable considerations bound up with any prayer for injunctive relief.

■ Whether an injunction will be granted rests, *inter alia,* with plaintiffs' showing that they will be irreparably harmed if injunctive relief is withheld. The availability of adequate monetary damages undermines a claim of irreparable injury. *Frank's GMC Truck Ctr. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988). Purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement. *Id.* (citation omitted). Where a plaintiff fails to adduce proof of actual or imminent harm which otherwise cannot be compensated by money damages, an injunction cannot issue. *Id.* The preliminary injunction must be the only way of protecting the plaintiffs from harm. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797 (3d Cir.1989) (citations

omitted). The United States Supreme Court has clarified irreparable harm as follows:

> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury. . . . 'The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'

*Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (quoting *Virginia Petroleum Jobbers Assn. v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958)). More than a risk of irreparable harm must be demonstrated. *Acierno v. New Castle County,* 40 F.3d 645, 655 (3d Cir.1994) (citations omitted). "The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury.'" *Id.*

In *Acierno,* the Third Circuit concluded that plaintiff real estate developer had not shown irreparable harm where Newcastle County, Delaware refused to issue a building permit for development of a shopping mall after plaintiff had let the project sit for twelve years after approval of his development plan. *Id.* This loss could be particularly susceptible to measurement by money damages. *Id.* The *Acierno* court was particularly focused on plaintiff's many other development options. "It is difficult," the *Acierno* court opined, "for us to believe that this particular development is uniquely important to Acierno in light of the testimony he gave at his deposition about all the other real estate projects in which he is interested." *Id.* at 654. Unlike this busy land developer in Delaware, who had many different and non-unique land deals going on at the same time, the relationship in the case at bar is between two well-acquainted and long-standing companies who have dealt exclusively with each other in Atlantic City. For A.C.

Coin, this is not just another deal. There is only one IGT.

With certain exceptions, most notably Louisiana's in-state distributor requirement, the A.C. Coin–IGT relationship is unique. Because of Atlantic City's development, and an accident of history, the industry's leading slot machine has made its way to casino floors because of a distributorship relationship which exists in virtually no other gaming jurisdiction. Part of this development clearly is attributable to A.C. Coin's lobbying on IGT's behalf to eliminate the "50 percent" Rule, which prohibited casinos from stocking more than 50 percent of any one slot machine manufacturer's products on their gaming floors. Indeed it could be argued that the way things were done in the past often constitutes an impediment to future progress. Preventing IGT from selling directly to its customers, as it wishes to do, may be such an impediment. It is in a sense a constraint on a party's freedom of contract. But the continuation of this special relationship and special way of doing business, is, in the words of the *Acierno* court "uniquely important" to Mac Seelig and his family-run operation and something the New Jersey Franchise Practices Act itself protects from disruption by authorizing injunctive relief in appropriate circumstances. *N.J.S.A.* 56:10–10.

IGT nevertheless contends that the termination of the 1993 Agreement is quantifiable in money damages by specific reference to A.C. Coin's past sales figures and gross earnings. The case of *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir.1970) (Friendly, J.), is instructive on this point. In *Semmes,* the plaintiff automobile dealership sought to enjoin the manufacturer from interfering with its customer relations and from terminating its dealership. *Id.* at 1200–1201. Among other reasons for Ford's actions against the plaintiff, Ford's own audits revealed allegedly fraudulent reimbursement claims made by the dealership to the manufacturer for repair work that was never done. *Id.* Without reaching the merits of these contentions, Judge Friendly found unpersuasive Ford's contention that Semmes had not demonstrated resulting irreparable harm from its termination of the dealership. He

found that there was something else present—something intangible—that was not quantifiable in monetary terms:

> Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award.... Moreover, they want to continue living.

*Id.* at 1205. Before addressing the balance of the hardships prong of the injunction inquiry, Judge Friendly bolstered his analysis of plaintiff's case for irreparable harm by reference to Judge Goodrich's finding that "a judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, has had a Ford franchise for many years." *Id.* (citing *Bateman v. Ford Motor Co.,* 302 F.2d 63, 66 (3d Cir. 1962)).

In the Third Circuit, *Semmes* has given rise to a significant progeny of courts following its lead in concluding that the termination of a long-standing business relationship can result in irreparable harm. In *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 233 (D.N.J.1976), a preliminary injunction case asserting antitrust violations, breach of a distributorship contract, and violation of the New Jersey Franchise Practices Act by a beer manufacturer against a beer distributor, the court held that "the loss of business and good will, and the threatened loss of the enterprise itself, constitute irreparable injury to the plaintiff sufficient to justify the issuance of preliminary injunction." *Id.* at 236 (citing *Semmes,* 429 F.2d at 1205; *Interphoto Corp. v. Minolta Corp.,* 417 F.2d 621, 622 (2d Cir.1969) (citing *Semmes* ); *Brennan Petroleum Prods. Co. v. Pasco Petroleum Co.,* 373 F.Supp. 1312, 1316 (D.Ariz.1974); *cf.* D. Dobbs, Remedies § 12.18, at 884–85 (1973)). The *Gelardi* court also considered the failure to grant preliminary relief's resultant

economic hardship for the plaintiff's employees. *Id.* It goes without saying that if IGT were allowed to terminate the 1993 Agreement, and with no comparable manufacturer to take IGT's place on the horizon, A.C. Coin would not have a need for nearly the number of employees it currently has on its payroll.

Eastern District of Pennsylvania cases are in accord. In *Goldhaber v. Foley,* 519 F.Supp. 466 (E.D.Pa.1981), court reporters who were to be replaced by a court reporting service requested a preliminary injunction to help them retain their jobs. With reference to *Semmes,* 429 F.2d at 1205, the *Goldhaber* court wrote: "To remove [the court reporters] from their established careers and force them to seek new employment would constitute irreparable injury, even assuming that they had available a cause of action for damages which would recompense them for any pecuniary loss." *Goldhaber,* 519 F.Supp. at 475. Recognizing this favorable treatment of *Semmes* in the district courts of the Third Circuit, the court more recently in *McCarthy v. Arnold Foods Co., Inc.,* 717 F.Supp. 325, 329 (E.D.Pa.1989) allowed a plaintiff to successfully argue that there was irreparable harm in the termination of a fourteen-year-old wholesalership.

In *Amana I,* 1992 U.S. Dist. LEXIS 17918, *9 n. 4 (D.N.J. Jan. 23, 1992), the court likewise recognized even more recently that the loss of goodwill may constitute irreparable harm for purposes of the preliminary injunction analysis:

> There is no question that, absent an injunction, Cooper will be irreparably harmed. Its relationship with Amana is responsible for 85% of its business; indeed, Cooper sold between $18–19 million dollars of Amana products between July, 1990 and July 1991 (Cooper Dep. at 90)— and their interdependency has enabled Cooper to develop over the years a system of more than 240 dealers ... [T]here is no evidence that, absent an injunction and with the termination that will result, Cooper will be able to replace even a fraction of Amana's business or the damage to Cooper's good will and reputation that

> Cooper and Amana have together built up and nurtured.... *Id.* at *5

IGT points out that Mac Seelig has had conversations with various casino executives to explore the possibility of a distributorship arrangement whereby A.C. Coin would represent another manufacturer's products. IGT overemphasizes the fruitfulness of Seelig's discussions. A review of the deposition testimony given by these top executives reveals that they would merely listen to, or entertain proposals from, A.C. Coin on behalf of another slot machine manufacturer.

The fact is, however, that none of these "deals" is set in stone. That casino executives might listen to new offers is a far cry from having arrangements made to fully replace one's only substantial client. As it stands now, termination is imminent, with no indication of anything materializing that comes anywhere close to the magnitude of A.C. Coin's relationship with IGT. With nothing on the horizon, the immediate and actual harm plaintiffs can expect to suffer is, as of termination, that they lose their very valuable supply line to IGT. The relationship would be severed. A.C. Coin could no longer earn revenue from servicing IGT machines or be the local sales or leasing conduit for IGT games. Mere sales talk of future cooperation with Mac Seelig does not redress the immediate consequences of IGT's present termination of A.C. Coin.

Although not cited by either of the parties in their briefs, IGT relied heavily at oral argument on *Westfield Centre Serv.,* 86 N.J. 453, 432 A.2d 48, for the proposition that A.C. Coin's threatened injury is of the type compensable in monetary damages. With reference to § 10 of the New Jersey Act, which permits the issuance of an injunction "where appropriate," counsel for IGT argued that "you don't get *permanent* injunctions under this statute absent some situation where that's the only real remedy, a defendant is judgment proof [sic]." Tr. of May 20, 1998 Hr'g, at 11 (emphasis added). The *Westfield* court in fact stated that

> the Legislature has placed primary emphasis on the right to damages, leaving courts free to exercise their discretion to grant injunctive relief to meet the equities of the

particular case. Where, as here, a franchisor's decision to terminate a franchise is based on bona fide business reasons, an injunction would not be available *except for temporary relief.*

*Westfield,* 86 N.J. at 467, 432 A.2d 48 (emphasis added). In the case of a permanent injunction, counsel's interpretation indeed would be correct. This interpretation is inapplicable to the case at bar for one simple, obvious reason: Plaintiffs do not, at this stage, seek a "permanent" injunction. They seek a preliminary injunction to maintain the status quo pending an ultimate resolution of this litigation. The quoted language above from the *Westfield* court explicitly states that an injunction is available for "temporary relief" where the decision to terminate a franchise is based on "bona fide business reasons." Nothing could more closely resemble the nature of the potential termination in this case. Its essence is captured by the president of IGT's letter which triggered this lawsuit:

> "This is a *business judgment* made by the management team at IGT, and it is a judgment in which I concur ... I sincerely hope that upon reflection you will understand that this is a decision that IGT has made *in the interest of its shareholders* ...."

Baker Letter of Sept. 3, 1997 (emphasis added).

It is clear from oral argument that IGT's able counsel must have recognized the distinction between the preliminary nature of the relief sought by A.C. Coin and the language of permanent relief discussed by the *Westfield* court. Counsel attempted to meld the standards together [25] by stating: "My only point is if there can be no permanent injunction, then the only question about a preliminary injunction is why would you need one to maintain the status quo for a damages case, not for a case about whether one puts Humpty Dumpty back together again?" Hr'g Tr. at 12. This analysis, too, is not persuasive for another simple, obvious reason: This is not just a "damages" case. Plaintiffs' very first count of their Amended Complaint is one for declaratory judgment pursuant to 28 U.S.C. § 2201, seeking the maintenance of the A.C. Coin–IGT relationship:

> ... [T]here now exists an actual, justiciable controversy between plaintiffs and IGT within the meaning of 28 U.S.C. § 2201. This Court is vested with the power to declare and adjudicate *A.C. Coin's rights and other legal relationships of all the parties* to the instant action with reference to the issues raised by this Complaint, *specifically to declare that A.C. Coin is a franchise,* that IGT's prospective termination of the franchise is without good cause, that A.C. Coin is *entitled to injunctive relief,* that IGT has violated A.C. Coin's contractual rights and that IGT has engaged in tortious conduct against A.C. Coin as alleged herein.

Am. Compl. at ¶ 64 (emphasis supplied). As such, IGT's characterization that there is no need to maintain the status quo pending a determination of damages is misplaced. Neither is the inquiry whether "Humpty Dumpty"—or A.C. Coin—will be put back together again at a later date. From plaintiffs' prayer for declaratory judgment, it is clear that this case is instead about keeping Humpty Dumpty from falling off the wall, having a great

---

**25.** The two standards for preliminary and permanent injunctions cannot, in fact, be reconciled. As the Third Circuit noted in *American Civil Liberties Union of New Jersey v. Black Horse Pike Reg'l Bd. of Educ.,* 84 F.3d 1471, 1477 (3d Cir. 1996), a preliminary injunction finding is based on an assessment of the likelihood that a plaintiff would succeed on the merits, and "neither constitutes nor substitutes for an actual finding that plaintiffs *have succeeded* on the merits and are entitled to permanent relief." (Emphasis added).

The four factors governing a district court's decision whether to issue a preliminary injunction are: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether the preliminary relief will be in the public interest." *Id.* n. 2 (citations omitted).

On the other hand, "[i]n deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (*i.e.,* met its burden of proof). If so, the court must then consider the appropriate remedy." *Id.* n. 3 (citation omitted).

fall, and shattering into a million pieces in the first instance.

Also crucial to the Court's analysis is A.C. Coin's good will. Some casino executives have expressed some reservation about instantly jumping at the prospect of Mac Seelig marketing a new product after all these years of telling them that IGT's products are superior. When the 1993 Agreement terminates A.C. Coin will lose its direct supply line to the most sought-after gaming machines in the industry. This is hardly a remote, theoretical injury; it is actual and immediate. These casino executives credibly testified that given, IGT's recognized superiority in the gaming industry, they would not instantly jump at a new product pushed by Mac Seelig unless it were on par with IGT's games. The present state of the industry suggests that no such product exists. Dave Jonas' comment that he has been gradually attempting to remove Bally's products from his Showboat gaming floor bolsters this conclusion.

While there are other aspects of A.C. Coin's business—its various divisions—nothing these cottage industries produces compares in prestige to the exclusive right to sell, lease, and service IGT products. IGT, in this regard, misses the point. That A.C. Coin has other possibly viable aspects of its business is irrelevant for purposes of the NJFPA. Indeed, this is because the Act itself contemplates as a base line threshold that the purported franchisee only maintain a 20 percent level of business from the franchisor. If only a "mirror-image" relationship could constitute a franchise, the New Jersey Legislature would have added a superfluous requirement into the Act. *ISI,* 130 N.J. at 355, 614 A.2d 124.

### D. The Balance of the Relative Harms

Many of the injunction cases cited by the parties do not reach the issue of the balance of the harms in the event an injunction is granted. The reason for this is that most courts find that the plaintiff fails to establish a reasonable likelihood of success on the merits or cannot demonstrate the requisite irreparable injury. As such, they never reach the balancing of the equities required by the third injunction prong. In *Amana I* Judge Barry reached this prong and held that where a major appliance manufacturer, Amana, wished to terminate its "franchise" agreement with its local distributor, the issuance of an injunction would not harm Amana more than its "franchisee." She noted that "Amana has dealt most profitably with Cooper for more than 30 years and all it stands to lose if the injunction is granted is the additional profit it has calculated it would make were an injunction to be denied and until the final decision of this or another court." *Id.* at *5.

IGT asserts that if it is not allowed out if its current relationship with A.C. Coin it will be unable to control its own sales, pricing, and marketing in Atlantic City. IGT's Concl. of Law ¶ 86. Without any further elaboration by IGT, the Court only reads this as an ability to earn greater profits, a factor which, as Judge Barry has suggested, does not outweigh the potential harm it may cause to a plaintiff. "By gaining the ability to set its own prices and direct its own marketing and sales," IGT contends, "IGT can ensure that its customers in Atlantic City pay a comparable price for slot machines that those same customers pay in other jurisdictions." *Id.* "IGT's arrangement with A.C. Coin and IGT's consequent inability to set its own prices is the direct cause of such higher costs borne by such customers." *Id.* IGT's customers, however, are not before this Court. Whatever cost-related injuries they may suffer by paying higher prices as a result of IGT's contractual obligation is irrelevant to the balance of the hardship between the litigating parties.

IGT has not demonstrated what it stands to lose by the granting of an injunction against it. Rather, as plaintiffs point out, all IGT stands to lose are additional profits to be gained in eliminating its distributor and dealing directly with the casino executives for the sale of its slot machines. Moreover, IGT has "dealt most profitably" with A.C. Coin over the past 15 years. When A.C. Coin became IGT's exclusive sales conduit and service source in 1983, IGT had nowhere close to the market share of slot machines, goodwill, respect, and the recognized reputa-

tion for technological innovation it enjoys today. IGT is, bar none, the leading manufacturer of slot machines. Forcing IGT to continue to enjoy its profits and ever-increasing reputation, when compared to the impact on A.C. Coin, is a small price to pay during the pendency of this action.

### E. The Public Interest

As Judge Gibbons observed in *SK & F Co. v. Premo Pharm. Lab., Inc.,* 625 F.2d 1055, 1067 (3d Cir.1980), "The public interest is not something that courts and judges can know by feeling vibrations from the cosmos." It is rather "reflected in the law of some appropriate sovereignty." *Id.* The court must look to the public policies embodied in the laws which are the subject of the action. *Id.* at 1067 (noting public policies behind the Lanham Act and New Jersey common law in ascertaining appropriateness of preliminary injunction).

When enacted, the drafters of the Act recognized that although both parties to a franchise relationship may reap economic benefits therefrom, the disparity in their respective bargaining power may lead to unconscionable provisions in franchise agreements. *Westfield,* 86 N.J. at 461, 432 A.2d 48. Franchisors are apt to draft contracts permitting them to terminate or refuse to renew franchises at will or for a wide variety of reasons including failure to comply with unreasonable conditions. *Id.* at 462, 432 A.2d 48. The unfortunate result was that some franchisors terminated or refused to renew viable franchises, leaving franchisees with nothing in return for their investment. *Id.*

In *Shell Oil Co. v. Marinello,* 63 N.J. 402, 307 A.2d 598 (1973), Justice Sullivan found that franchise provisions allowing termination without good cause were the result of a "disproportionate bargaining position" and were "grossly unfair." *Id.* at 409, 307 A.2d 598. Writing for the court, he declared such clauses void as against public policy. *Id.* at 409–11, 307 A.2d 598.[26] The Legislature similarly declared that

distribution and sales through franchise arrangements in the State of New Jersey vitally affect the general economy of the State, the public interest and the public welfare. It is therefore necessary in the public interest to define the relationship and responsibilities of franchisors and franchisees in connection with franchise arrangements.

*N.J.S.A.* 56:10–2. The Act's legislative statement, moreover, provided as follows:

New Jersey would do the same in this bill which, through the courts, would rule out arbitrary and capricious cancellation of franchises while preserving the right of franchisors to safeguard their interests through the application of clear and non-discriminatory standards. The bill would protect the substantial investment tangible and intangible of both parties in the various franchises. It would rule out economic coercion as a business tactic in this most sensitive field.

The New Jersey Legislature has been asked many times in the past to deal on a piecemeal basis with various problems growing out of the franchise relationship. This bill would provide a comprehensive statutory formula for resolving a wide range of questions growing out of the franchise relationship.

Statement Accompanying Assembly Bill 2063 (1971). The Act, at its essence, is a legislative solution to a problem identified by the New Jersey courts before its passage: "... [T]he marketplace was not necessarily the best protector of those franchisees with substantially-inferior bargaining power...." *ISI,* 130 N.J. at 339, 614 A.2d 124.

■ The parties dispute the nature of their past contract negotiation sessions. Plaintiffs claim that they were conducted "at arm's length," while IGT contends that A.C. Coin was (with Seelig calling the shots) no mere tiny competitor in a world of giants but rather a sophisticated business entity. While the earlier cases may have discussed the wrongful inclusion of unconscionable clauses

---

**26.** *Marinello* was decided after the enactment of the NJFPA, but dealt with a franchise agreement entered into before the effective date of the stat-

ute, thus making the Act inapplicable. *Westfield,* 86 N.J. at 453 n. 2, 432 A.2d 48.

contained in franchise agreements—and arguably this is why the parties focus on their past bargaining sessions—the nature of this dispute has nothing to do with an unconscionable contract provision, or A.C. Coin's failure to satisfy such a condition. A.C. Coin has performed all of its contractual obligations, as IGT readily concedes. A.C. Coin can show with a reasonable likelihood of prevailing on the merits that IGT had no good cause. The dispute in this case could not have been remedied by more equal bargaining power.

But after ceaselessly promoting IGT's products as superior, making IGT what it is today, hosting parties to benefit IGT, fixing IGT machines on a 24–hour basis and making improvements to them, jointly advertising with IGT, A.C. Coin could be left with nothing to show for its numerous investments and its 15 years worth of effort. This the Act was designed to proscribe. *See Neptune T.V.*, 190 N.J.Super. at 163–64, 462 A.2d 595.

### IV. Injunction Bond

At the conclusion of oral argument on May 20, 1998, the Court ordered the parties to submit proposed findings of fact and conclusions of law by May 29, 1998. Immediately thereafter, the following colloquy ensued:

> MR. CALMANN: Your Honor, would our findings of fact and proposed conclusions of law be submitted on the 29th?
>
> THE COURT: Yup.
>
> MR. CALMANN: Okay, then I will talk to Mr. Riemer [counsel for IGT] about the bond issue.
>
> THE COURT: By the close of business on the 29th, and you do it independently of each other. You can exchange them, but do them independently of each other. *I don't want any responses to them, just let the other side know what you proposed to me.*

May 20, 1998 Hr'g Tr. at 49–50 (emphasis added).

Following the submission of two affidavits in support of IGT's demand for bond, and A.C. Coin's submission of a brief and affidavits in opposition thereto, and in violation of the Court's explicit directive that there were to be no responses, IGT filed additional reply affidavits and a brief presenting legal arguments contrary to those raised in A.C. Coin's brief. By way of a letter dated June 24, 1998, counsel for A.C. Coin pointed out that, based on the Court's directive, no additional reply materials were to be submitted. *See* June 24, 1998 Letter of Arnold B. Calmann, Esquire, at 1–2. Included in this very letter was yet more informal letter briefing in reply to IGT's unauthorized reply materials. Also filed on June 24, 1998 on A.C. Coin's behalf was yet another reply affidavit, this time of Richard L. Robbins, C.P.A., in response to IGT's demand for bond.

This case throughout has been remarkably well litigated, the briefing professional and civil, and counsel have thus far conducted themselves in an exemplary fashion. But when the Court orders that no additional materials be submitted, it expects that such an order will be obeyed. The Court clearly did not intend for there to be a full moving brief-reply-sur-reply briefing schedule as is customary in the normal motion practice. At some point, the flow of paper must cease. As such, the Court considers only those materials originally submitted by IGT and A.C. Coin's responsive papers.

FED. R. CIV. P. 65(c) provides:

> **Security.** No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

*See also* Local Rule 65.1 (security may be in the form of a bond). The amount of the bond is left to the discretion of the district court. *Frank's GMC Truck Ctr.*, 847 F.2d at 103.

■ A.C. Coin suggests, based on the economic analysis of Richard Robbins, C.P.A., that because it would be more profitable in fiscal year 1999 for IGT not to terminate the 1993 Agreement, no bond is required in this case. Pls.' Br. in Opp. to Bond at 10. A situation involving no risk of monetary loss to a defendant who is wrongfully enjoined would be most extraordinary. Ab-

sent circumstances where there is no risk of monetary loss to the defendant, the failure of a district court to require a successful applicant to post a bond constitutes reversible error. *Frank's GMC Truck Ctr.*, 847 F.2d at 103.

In fact, no Third Circuit case has upheld a district court's excuse of the security requirement in Rule 65(c). *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 210 (3d Cir.1990). Moreover, A.C. Coin has pointed to no subsequent case excusing the requirement to post security. Accordingly, the Court declines, in its discretion, to give this suggestion—that IGT will not be damaged at all by a wrongfully entered injunction—any credence.

Having determined that plaintiff A.C. Coin is entitled to an injunction, and that the posting of security shall be required, the Court must determine the appropriate amount. To say that the parties are far apart on the amount of an injunction bond is an understatement. IGT requests $9,500,-000. *See* May 29, 1998 Letter of Samuel B. Santo, Jr., Esquire. In stark contrast, A.C. Coin requests that no more than an amount within the $600,000 to $700,000 range be required. Pls.' Br. in Opp. to Bond at 1.

The Court has before it the affidavit of Thomas Ballinger, Director of IGT Services for North America. Ballinger states that in anticipation of the 1993 Agreement's termination, "early in 1998 IGT began to make preparations for the opening of its 'IGT Service, New Jersey operation.'" Ballinger Aff. ¶ 3. These preparations included hiring numerous new employees, leasing of two new facilities in the Atlantic City area. *Id.* ¶ 4. "The sole and intended business function of IGT Service, New Jersey is to assume the IGT-related functions heretofore performed in New Jersey by AC Coin pursuant to the 1993 Distributorship Agreement, namely, the preparation and installation of new system and non-system slot machines, servicing of IGT slot machines, maintenance of a parts inventory, parts sales, etc." *Id.* ¶ 5. Twenty-one (21) new employees were hired for this operation. *Id.* In the event IGT is enjoined, IGT would have no business purpose

for its recently created IGT Service, New Jersey. *Id.* ¶ 8.

In addition, Ballinger avers that the task of selling IGT's new non-systems games was assigned to Tim Shortall, a new IGT employee in IGT's existing Atlantic City office. *Id.* ¶ 6. His annual salary, including benefits, is $140,000. *Id.* Adding to this expense is the cost of the other 21 employees ($786,186), plus leasing costs of $182,800, for a subtotal of $950,986. *Id.* ¶ 7 Combined with Shortall's salary, Ballinger's final subtotal equals $1,090,986. *Id.* ¶ 9.

Paige Smith, IGT's Finance Supervisor, in her affidavit, contends that based on a "Distributor Analysis" she helped to compile, if IGT is compelled to utilize A.C. Coin for fiscal year 1999, and if A.C. Coin's "current trend of poor sales performance continues, then IGT would suffer a $8,515,787 *loss* of pre-tax operating income." Smith Aff. ¶ 16 (emphasis in original). Smith cites "confusion in the market place" as one of the reasons for A.C. Coin's alleged drop in sales in fiscal year 1998. *Id.* ¶ 4.

Adding up Ballinger's subtotal of $1,090,-986 with Smith's figure of $8,515,787 actually leads to an amount above $9,500,000. To be accurate, the number is $9,606,773. This discrepancy is, however, of no consequence because the Court, in its discretion, determines that a bond amount approaching one-third of plaintiffs' 1997 revenue is excessive. A.C. Coin's allegedly slumping sales and any confusion within the marketplace during the pendency of this litigation is arguably the result of IGT's own termination of the 1993 Agreement.

The profits anticipated by IGT's ability to sell directly to customers, and the operating expenses associated therewith, similarly cannot be borne justly by A.C. Coin on the posting of security. According to Ballinger, IGT's efforts to undertake A.C. Coin's functions began in "early 1998," well after IGT's decision not to renew the 1993 Agreement. During that time, Thomas McCormick, Esquire, A.C. Coin's General Counsel, contends that he communicated to Marc D. Foodman, Esquire, IGT's Associate General Counsel, his client's position that under the New Jersey Franchise Practices Act and relevant

case law IGT could not lawfully terminate A.C. Coin's distributorship agreement. McCormick Aff. ¶ 16. McCormick further asserts that Foodman responded by claiming that IGT had "no exposure" under the Act. *Id.* ¶ 17. Whatever the communications may have been, IGT's conduct of incurring new costs for IGT Service, New Jersey indicates a tacit belief that it had "no exposure" under the Act.

The Court today merely rules that A.C. Coin has proven that it has a reasonable likelihood of ultimate success on the merits which, along with other factors, have entitled it to the preliminary injunction it seeks. IGT, on the other hand, made the choice early on in this litigation to assume that it would ultimately prevail and has incurred expenses flowing from that belief. The outcome of litigation is uniquely ill-suited to prediction with positive assurance. Nevertheless, IGT chose to take that risk, for whatever reason. This Court cannot go behind or question a corporation's own business decisions. The unintended results of such decisions, however, may not be foisted on plaintiffs who have not contributed to them.

The Court does have recourse to the *Amana I* decision for a comparison of an appropriate measure of a bond. In *Amana I*, 1992 U.S. Dist. LEXIS 17918, the parties had a 30–year exclusive distributorship relationship, and the distributor had sales of $18–19 million annually. *Id.* at *4–5. In that case, Judge Barry imposed an injunction bond of $350,000. *See* Feb. 10, 1992 Order (entered Feb. 13, 1992), 1992 U.S. Dist. LEXIS 17472. A.C. Coin, having spent 15 years with IGT, claims $32,000,000 in annual IGT gross revenue. *See* Robbins Injunction Aff. ¶ 4. Given that A.C. Coin has almost twice as much revenue from its alleged franchisor as did Cooper in the *Amana I* decision, and accounting for the passage of time, the Court concludes that an injunction bond of $700,000 is appropriate.

### V. Conclusion

For all of the foregoing reasons, the Court grants plaintiffs' motion for a preliminary injunction pursuant to FED. R. CIV. P. 65. Because the Court has determined that plaintiffs have proven that they have a rea-

sonable likelihood of success on the merits in their cause of action arising under the New Jersey Franchise Practices Act, it need not determine the merits of their other claims for relief. As security for this equitable remedy, the Court concludes, in its discretion, that the posting of a $700,000 injunction bond is appropriate. Given the professional and courteous business relationship IGT and A.C. Coin have enjoyed over the past 15 years, and the overall lack of enmity existing between the parties, the Court is satisfied that A.C. Coin and IGT can successfully work together over the coming months in a cooperative spirit pending a final resolution of this case.

The Court will enter an appropriate order.

### ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**THIS MATTER,** having come before the Court on the motion of plaintiffs Atlantic City Coin & Slot Service Company, Inc. and Mac Seelig ("plaintiffs") filed March 19, 1998; and

The Court, having conducted oral argument on the motion on May 20, 1998, the parties having stipulated that no testimony would be presented at such hearing; and

The Court, having extended the June 12, 1998 termination of the present contractual relationship between the parties to July 12, 1998 at said hearing; and

Having considered the moving papers of the parties, along with documents, exhibits, and affidavits in support thereof with respect to the motion; and

Having considered the parties' proposed findings of fact and conclusions of law; and

Having considered one submission each from the parties with respect to the propriety and amount of a bond as security for plaintiffs' requested preliminary injunction; and

For the reasons set forth in the Court's opinion of this date;

**IT IS,** on this 10 th day of July, 1998 hereby **ORDERED** that, until further order

of this Court, defendant IGT, and its agents, servants and employees, be and are hereby preliminarily **ENJOINED** from terminating plaintiffs' June 12, 1993 "Exclusive Distributorship Agreement" and all other agreements pertaining in any way thereto, except in accordance with the New Jersey Franchise Practices Act, *N.J.S.A.* 56:10–2 *et seq.*, and from taking any action undermining, or inconsistent with, those agreements; and

**IT IS FURTHER ORDERED** that a bond or equivalent cash security in the amount of $700,000.00 be posted by plaintiffs A.C. Coin and Mac Seelig within ten (10) days of the date of this order, pursuant to FED. R. CIV. P. 65(c).

No costs.